[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-16412

_____

D. C. Docket No. 04-00509-CV-WHA

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 16, 2008
THOMAS K. KAHN
CLERK

HOLLY  WOOD,

Petitioner-Appellee,
Cross-Appellant,

versus

RICHARD F. ALLEN, Commissioner,
Alabama Department of Corrections,
TROY KING, The Attorney General of
the State of Alabama,
Grantt Culliver, Warden,

Respondents-Appellants,
Cross-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Alabama

_____

(September 16, 2008)

Before DUBINA, BARKETT and HULL, Circuit Judges.

HULL, Circuit Judge:

The State of Alabama appeals the district court's grant of the habeas writ to Holly Wood, which vacated his death sentence based on counsel's ineffective assistance in failing to investigate and offer sufficient mitigation evidence. Wood cross-appeals the denial of his claims that: (1) he is mentally retarded and ineligible for the death penalty under Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002); and (2) the prosecutor's peremptory strikes violated Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). After review and oral argument, we affirm the district court's denial of Wood's Atkins and Batson claims and reverse its decision that Wood's counsel rendered ineffective assistance.

## I. The Crime and Procedural History

### A.   The Crime

On the night of September 1, 1993, Wood brutally killed Ruby Lois Gosha, who was Wood's former girlfriend and the mother of his child. See Wood v. State, 715 So. 2d 812, 813 (Ala. Crim. App. 1996). About two weeks prior to murdering Ruby, Wood had assaulted Ruby, cutting her and causing her to lose the use of two fingers. Id. at 814. In addition to the testimony of Ruby's mother in that regard, the autopsy showed recent bruises on Ruby's palm and the back of her left hand, two recent trauma-induced scars on her right forearm, and recent scars on her left

2

forearm and upper arm.  Id.

On the night of the murder, around 5:00 p.m., Ruby's mother told Wood to leave her home (where Ruby lived) and not come back.  Id. at 813-14.  Wood returned to Ruby's mother's house around 9:00 p.m., snuck into Ruby's bedroom with his 12-gauge shotgun, and shot Ruby in the head and face, fracturing her skull and injuring her brain.  Id. at 814.  There was a gunshot wound near her eye and one near her cheek.  Id.  Ruby was dead by the time the ambulance got her to the hospital.  Id.

After shooting Ruby, Wood that night told his cousin, Calvin Salter, "I shot that bitch in the head, and [blew] her brains out and all she did was wiggle."  Id. at 815 (alteration in original).  Wood also told Salter that he had attempted to stab Ruby in the heart sometime prior to the shooting, but Ruby had thrown her arm up to protect herself, and he had stabbed her in the arm instead.  Id.  Thus, although Ruby had tried to escape Wood's domestic violence and although her mother had tried to keep Wood away from her home, Wood managed to sneak into the home late at night and kill Ruby at point-blank range in her own bed.

At the time Wood killed Ruby, he was already on parole for a prior violent felony shooting of another former girlfriend.  See id. at 819.  In short, Ruby was not Wood's first domestic violence shooting victim, and the State sought the death

3

penalty for Ruby's murder.

**B.     Procedural History**

On October 20, 1994, the jury unanimously convicted Wood of capital murder during a first-degree burglary.  The jury recommended a death sentence by a 10-2 vote.  After a pre-sentencing report and a separate sentencing hearing, the trial judge sentenced Wood to death.  On direct appeal, the Alabama Court of Criminal Appeals ("Alabama Appeals Court") rejected Wood's <u>Batson</u> claim and affirmed his conviction and death sentence.  <u>See</u> <u>Wood v. State</u>, 715 So. 2d at 817, 819.  The Alabama Supreme Court also affirmed Wood's conviction and sentence. <u>Ex parte Wood</u>, 715 So. 2d 819 (Ala. 1998).

After the United States Supreme Court denied Wood certiorari, <u>Wood v. Alabama</u>, 525 U.S. 1042, 119 S. Ct. 594 (1998), Wood filed a petition for post-conviction relief under Alabama Rule of Criminal Procedure 32.[1]  Wood's Rule 32 petition claimed that (1) he is mentally retarded and not eligible for a death sentence, and (2) his trial counsel were ineffective by failing to investigate and present evidence of his mental deficiencies during the penalty phase.  After two evidentiary hearings, the Rule 32 court denied Wood's Rule 32 petition in two separate orders.

_____

[1]Wood filed a <u>pro se</u> Rule 32 petition in 1999, a counseled amended Rule 32 petition in 2000, and a counseled second amended Rule 32 petition in 2001.

4

After these Rule 32 orders, the United States Supreme Court decided Atkins, and the Alabama Appeals Court remanded Wood's Rule 32 case in light of Atkins. Wood v. State, 891 So. 2d 398, 402 (Ala. Crim. App. 2003). On remand, the Rule 32 court conducted an extensive evidentiary hearing and issued a third Rule 32 order thoroughly discussing Wood's claims and denying them. The Rule 32 court found that Wood was not mentally retarded and his counsel were not ineffective. The Alabama Appeals Court adopted and affirmed the Rule 32 court's findings and denial of Wood's claims. See Wood v. State, 891 So. 2d 398, 413 (Ala. Crim. App. 2004). The Alabama Supreme Court denied certiorari. Ex parte Wood, No. 1030817 (Ala. May 21, 2004).

Wood then filed his 28 U.S.C. § 2254 petition. The district court denied Wood's Atkins and Batson claims, but granted relief on Wood's claim that his counsel were ineffective in the penalty phase by failing to investigate and present evidence of his deficient "intellectual functioning." Wood v. Allen, 465 F. Supp. 2d 1211, 1228-29, 1232, 1245 (M.D. Ala. 2006). This appeal followed.

## II. Standard of Review

We review the district court's grant or denial of habeas relief de novo. See Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007); McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005); Sims v. Singletary, 155 F.3d

5

1297, 1304 (11th Cir. 1998). However, under § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our review of a final state court habeas decision is "greatly circumscribed and is highly deferential to the state courts." Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002).

Section 2254(d) permits federal habeas relief only where the state courts' decisions were (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); Stewart, 476 F.3d at 1208.[2] "[A] determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Henyard v. McDonough, 459 F.3d 1217, 1240 (11th Cir. 2006), cert. denied, __ U.S. __, 127 S. Ct. 1818 (2007); Marquard v. Sec'y for the Dep't of Corr., 429 F.3d 1278, 1303 (11th Cir. 2005). Thus, "[o]ur review of findings of fact by the state court is even more deferential than under a clearly erroneous

---

[2]"The phrase 'clearly established Federal law,' as used in § 2254(d)(1), encompasses only the holdings, as opposed to the dicta, of the United States Supreme Court as of the time of the relevant state court decision." Stewart, 476 F.3d at 1208-09.

6

standard of review." Stephens v. Hall, 407 F.3d 1195, 1201 (11th Cir. 2005).

With these highly deferential standards in mind, we turn to Wood's Atkins, Batson, and ineffective assistance claims, in that order.

### III. Atkins

We agree with the district court that the Alabama courts' rejection of Wood's mental retardation claim was not contrary to, or an unreasonable application of, Atkins, or based on an unreasonable determination of the facts.

The Supreme Court in Atkins held that the Eighth Amendment prohibits the execution of mentally retarded persons. Atkins, 536 U.S. at 321, 122 S. Ct. at 2252. The Supreme Court left "'to the States the task of developing appropriate ways to enforce the [Atkins] constitutional restriction.'" Id. at 317, 122 S. Ct. at 2250 (brackets and citation omitted). As the Rule 32 court recognized, Alabama law provides that a defendant making an Atkins claim must establish three elements to show mental retardation: (1) significantly subaverage intellectual functioning (defined as an Intelligence Quotient ("IQ") of 70 or lower); (2) significant or substantial deficits in adaptive behavior; and (3) that both of the first two problems manifested themselves during the defendant's "developmental period" (before the defendant reached the age of eighteen). See Smith v. State, __ So. 2d __, 2007 Ala. LEXIS 91, at *19-21 (Ala. May 25, 2007); Ex parte Perkins,

7

851 So. 2d 453, 456 (Ala. 2002).

After three evidentiary hearings, the Rule 32 court applied this standard and found Wood is not mentally retarded because he does not have significant or substantial deficits in his adaptive functioning but instead has a high level of adaptive functioning.[3] The Rule 32 court found Wood: (1) was able to obtain and maintain employment and had worked at several jobs for a lengthy amount of time, such as driving a forklift, driving motor vehicles, working in a factory, and operating heavy machinery and equipment in a dangerous work environment; (2) was able to function well independently and did not need the assistance of others to complete daily tasks; (3) managed his own money and always had money; (4) did not have problems communicating or getting his needs met verbally or through written language; (5) was able to plan and cook meals for himself and others; (6) could identify and resolve typical problems that might arise in everyday life (such as checking the fuse box if the lights went out in his house); (7) was always neat and clean in his appearance; (8) often drove himself out-of-state to visit relatives and for other reasons, and in fact was an automobile enthusiast who subscribed to Hot Rod magazine; (9) could form and maintain interpersonal relationships with

---

[3]Although the Rule 32 court concluded Wood "probably" met the first element of the test—subaverage intellectual functioning—the Rule 32 court determined it did not need to reach that issue because the second element of the test—significant or substantial deficits in adaptive functioning—was not present.

others and had a girlfriend, Barbara Siler, for three years; and (10) devised and implemented a scheme to lure Siler out of her house to shoot her after she ended their relationship.

In finding that Wood has a high level of adaptive functioning, the Rule 32 court credited testimony from psychologists Dr. Harry McClaren and Dr. Gregory Prichard; Siler; Wood's former teachers; and Wood's former boss, Melvin Wright. Drs. McClaren and Prichard evaluated Wood together and concluded Wood was not mentally retarded because, while his full-scale IQ was 64 and his true IQ was between 61 and 69, Wood did not have significant or substantial deficits in his adaptive functioning. They administered the "Vineland" test for adaptive functioning and the Scales of Independent Behavior Revised Edition ("SIBR"). They interviewed Wood's "[t]eachers, boss, correctional officers, a man that had known his family, [and] sisters."[4]

Dr. McClaren testified that: (1) Wood "has been able to obtain and maintain a variety of jobs involving driving motor vehicles, working in a factory, [and] working heavy equipment," including a forklift and a front-end loader; (2) Wood worked in the kitchen while in prison; (3) Wood's heavy machinery jobs "required

---

[4]Dr. Prichard administered the SIBR to Wood and testified "Wood was assessing himself pretty high in terms of adaptive capacity." Dr. Prichard administered Vineland tests to Siler, Wood's former teachers Janet Penn and Hilda Maddox, sisters Johnnie and Maeola Wood, and correctional officers.

a degree of skill that is not typically associated with people who . . . are mentally retarded" and he could not "think of another mentally retarded person [he] examined that did that kind of work"; (4) Wood was able to explain in detail how to prepare a meal for a large number of people; (5) Wood had numerous cars in his life and paid cash for most of them; (6) Wood liked hot rodding and subscribed to Hot Rod magazine; (7) Wood knew to go to the fuse box if a light went out in his house; (8) Wood once borrowed money from a bank to buy a car but quickly repaid the loan so he could do things for the family; and (9) Wood was a sharp dresser and a "neat freak." Dr. Prichard's "bottom line finding" was that Wood's "adaptive skills are not impaired in the mentally retarded range." Dr. Prichard added that Wood's skills were "sufficient for independent functioning." Dr. Prichard agreed with Dr. McClaren's findings.

Four teachers testified about Wood's IQ and special education classes, and their testimony was consistent with that of the Rule 32 psychologists. Janet Penn—Wood's special education teacher—taught Wood for two or three years during junior high. Penn could have no more than fifteen students at a time, and usually she had twelve. Penn's special education students had an IQ range of 60-80, and Wood was a "pretty average" student who never failed. Penn did not recall Wood getting into trouble frequently, but as neat, clean, and on-time, albeit lazy,

10

sleepy, and a little moody. Penn thought Wood was probably classified as educable mentally retarded, which meant he was more productive than the students classified as trainable mentally retarded.[5]

Hilda Maddox—another special education teacher—testified the range of IQs for special education students was "low 50s to . . . . [maybe] 80." According to Maddox, Wood was in the middle range of the educable mentally retarded group of students, had an IQ in the low to mid 60s, and got C-range grades. Wood never failed and attended class on a regular basis, although he was quiet and did not always put forth maximum effort. Maddox confirmed Wood was very clean and had a very neat appearance.

Alfreida Griffen attended Luverne High School with Wood and is now its principal. The special education students were called "moles." The special education classroom was in the basement and called the "mole hole." Douglas Brown taught Wood in junior high physical education and found him to be a typical junior high school kid. Brown testified that "Holly B," Wood's nickname,

---

[5]Our colleague's separate opinion states that "Penn would have testified also that all of the special education students, regardless of age or grade level, were placed in one room in a basement." Judge Barkett Opinion, at 93. However, Penn did not testify that all special education students were placed in the same class regardless of age or grade level or that there was only one classroom in the basement. To the contrary, Penn apparently taught Wood in seventh, eighth, and ninth grade, and she testified that she could have no more than fifteen students at a time and usually had about twelve. Moreover, Penn testified that other special education teachers existed to teach older students, and Wood later had one of those teachers (Maddox).

11

was used as an insult.[6]

Wright—Wood's former boss at Sanders Lead Company—testified Wood was an average person who did not appear unusual and seemed to be like most other employees. Wood could follow instructions and did the work assigned to him; cooperated in a civil manner with his fellow employees; had no discipline problems; and was on-time, hard-working, and dependable. Once someone in Wood's position learned to do the work assigned, it was not complicated, but for a beginner, it was complicated work. The work environment was hazardous, and Wood could have been seriously injured if he was not alert and paying attention to detail.

Siler—Wood's former girlfriend—testified about their relationship. Siler dated Wood from 1981 to 1984. When they dated long distance for some of that time, Wood drove to see Siler over "most weekends" and "sometimes through the week." Wood was nice to Siler at the beginning; had a nice appearance; cared a lot about how he dressed, his hair, and his clothes; and did laundry frequently. When Siler met Wood, he drove a delivery truck and had worked for a funeral home and Sanders Lead Company. Wood always seemed to have money. He had three

---

[6]Brown also testified Wood was somewhat disheveled and occasionally had a bad, urine-like smell about him. However, Brown's testimony about Wood's physical appearance was contradicted by multiple witnesses who said Wood was very neat and clean. Penn and Maddox recalled no bad smells.

different cars during their relationship, liked his cars, and kept them well-detailed. When Wood visited Siler, they stayed at a motel and he would go inside and get the room. Nothing ever struck Siler as "slow or off" about Wood. Wood seemed like an average man, and, in fact, was "pretty capable."

Siler and Wood talked about the possibility of getting married, but Wood became abusive, and their relationship deteriorated. The sheriff came to Siler's mother's house because Siler and Wood were having an argument. The argument and the sheriff's visit upset Siler's mother, and Siler ended the relationship. This upset Wood, and he wanted to talk to Siler, but she did not want to talk to him. Wood then sent his friend to the door of her mother's house "to tell [her] to come outside" because Siler's mother would not have let Wood in. When Wood's friend told Siler to come outside to talk to Wood, Siler told him no, and she stayed inside and sat down on the couch. A few minutes later, Wood shot Siler through the window and fled. The Rule 32 court found Wood's ruse to shoot Siler "exhibited regrettable adaptability" on Wood's part.

Based on this wealth of evidence, the Alabama courts found Wood was not mentally retarded. Wood has not shown the Alabama courts' rejection of his mental retardation claim was contrary to, or an unreasonable application of, <u>Atkins</u>,

or based on an unreasonable determination of the facts.[7]

## IV. **Batson**

The district court also properly determined the Alabama courts' denial of Wood's Batson claim was not an unreasonable application of clearly established federal law or predicated upon unreasonable findings of fact. The district court determined that although Wood raised a Batson claim in the state courts, he did not make any sub-argument comparing black venire members who were struck with white members who were not struck. We agree with the district court and affirm its decision pursuant to Hightower v. Terry, 459 F.3d 1067 (11th Cir. 2006), cert. denied, __ U.S. __, 127 S. Ct. 2254 (2007), and Atwater v. Crosby, 451 F.3d 799 (11th Cir. 2006), without additional discussion.

## V. **Ineffective Assistance Claims**

The trial court appointed three attorneys for Wood: Cary Dozier and Frank Ralph, experienced trial attorneys, and Kenneth Trotter, a new attorney who shared office space with Dozier. Wood claims his counsel were ineffective in the penalty phase because they: (1) did not present to the jury evidence of Wood's borderline intellectual functioning and special education classes; and (2) failed to adequately

---

[7]The Rule 32 court did not credit the testimony of Dr. Karen Salekin. Wood has not claimed (and could not show in any event) any error in the Rule 32 court's exclusion of Dr. Salekin's testimony, and thus we do not discuss it.

14

investigate those issues before deciding against presenting mental health evidence.

To evaluate Wood's ineffective assistance claims, we review: (1) what each counsel said about their investigation, preparation, and trial decisions; (2) what mitigation evidence counsel discovered and presented to the jury and later to the sentencing judge; (3) the Rule 32 mitigation evidence that Wood argues his counsel should have investigated and presented; and (4) the fact findings and legal conclusions in the Rule 32 orders.

## A.    Dozier's testimony and Dr. Kirkland's report

Dozier had practiced for more than twenty years, represented capital defendants before, tried over a thousand felony cases, and had extensive criminal experience. Dozier had worked in the Alabama Attorney General's Office, for a judge on the Alabama Court of Criminal Appeals, for a private law firm, and as the Chief Deputy District Attorney in Montgomery County. Dozier was Wood's lead counsel, and, as detailed below, Dozier and Ralph were responsible for and involved in investigating all phases of the trial, including the sentencing and guilt phases.

Dozier testified Wood was always nice and cooperative and gave the trial team information about the case that it followed up on. Dozier used an experienced investigator, Pete Taylor, and was "sure" that Taylor met with Wood

and "members of [Wood's] family and other people."  Dozier used Taylor to "look into discovering mitigating evidence," and was "sure" the trial team interviewed "potential witnesses about childhood problems that Mr. Wood may have had." Although Dozier did not recall to which of Wood's family members he personally spoke, Dozier was "sure" he spoke to Wood's father and that the trial team "talked to several witnesses."

Investigator Taylor confirmed that all of his instructions on the Wood case came from Dozier and all of his meetings were with Dozier.  Taylor had thirty years of police experience.  He met with Wood for three hours and interviewed, inter alios, Wood's sisters Johnnie Wood and Susan Wood Caldwell, and his father, J.P. Wood.[8]

Dozier obtained and reviewed a psychological evaluation of Wood as possible mitigation evidence.  Dozier moved the state trial court to have Wood examined by a psychologist.  Dozier explained that when they sought to have Wood evaluated by a psychologist, they did so "for both competency and mental state at the time of the offense," as well as to "discover or get a lead on some possible mitigation evidence." (Emphasis added.)  Thus, Dozier sought a psychological evaluation for use in both the guilt/innocence and penalty phases.

---

[8]This testimony from Taylor and Dozier contradicts Wood's assertion that Taylor and Dozier failed to interview any family members for mitigation purposes.

Dr. Karl Kirkland, Ph.D., examined Wood and reviewed various documents. Dr. Kirkland evaluated Wood's intellectual functioning, as well as his emotional and mental health.

Dr. Kirkland administered the Wide Range Achievement Test-Revised and Minnesota Multiphasic Personality Inventory tests, and reported that Wood: (1) was "reading on less than a 3rd grade level"; (2) "could not use abstraction skills much beyond the low average range of intellect"; and (3) had "an IQ in the borderline range of intellectual functioning." Based on the tests and his clinical interview, Dr. Kirkland reported that Wood was "functioning, at most, in the borderline range of intellectual functioning."[9]

Wood told Dr. Kirkland he had no history of hospitalization, had never taken any psychoactive medication, and was not taking any medication at the time of the evaluation. Dr. Kirkland determined Wood had "problems with impulse control," "poor anger control," and "acting out behavior." Part of Dr. Kirkland's diagnosis was Axis II, Antisocial Acts. Wood reported to Dr. Kirkland that he had "felt injurious toward others in the past," and referenced having assaulted a different

---

[9]The dissenting part of our colleague's separate opinion in this case contends at great length that if counsel had conducted a more thorough investigation, counsel would have learned Wood had a low IQ, was reading at a third grade level and could not use abstraction skills much beyond the low average range of intellect. The fatal flaw in that dissent as to counsel's investigation is that counsel did investigate and did know all this months before the trial began. Wood's mental deficiencies were clearly outlined in Dr. Kirkland's May 13, 1994 report before the October 1994 trial.

17

girlfriend (Siler) by shooting her "through the window of her apartment after seeing her with another man." Indeed, Wood was on parole for his felony assault of Siler when he killed Ruby.

Dr. Kirkland reported that Wood "did not evidence any memory deficits"; had "a complete memory of his behavior at the time of the alleged offense"; had a "normal thought process"; and his "thinking was goal directed and logical." Dr. Kirkland concluded there was no mental disorder present that would detract from Wood's ability to appreciate the criminality of his murder of Ruby. Dr. Kirkland reported Wood felt he had a good relationship with his attorneys and had been able to discuss his case in detail with them.

As discussed later, Wood's counsel did not show Dr. Kirkland's report to the jury. The Rule 32 court found: (1) Wood's counsel decided that calling Dr. Kirkland was not in Wood's best interest; and (2) "counsel investigated a potential mental health defense, but decided against presenting it." Dozier was responsible for the decision whether to use Dr. Kirkland's report. Although Trotter handled the bulk of the courtroom portion of the penalty phase, Dozier was lead counsel at all times, and Trotter testified he "relied upon Mr. Dozier's opinion of [Dr. Kirkland's] psychiatry evaluation" and Dozier was the primary contact with Dr. Kirkland. Trotter testified Dozier and Ralph essentially "made the decisions and

18

told [him] what [he] was going to do." Dozier testified that had there been any useful information in Dr. Kirkland's report, he would have presented it, as follows:

> [Q.] Had there been information in [Dr. Kirkland's] report that you found useful for Mr. Wood to present, would you have presented it?
> . . . .
> A. We would have.
> Q. Including what was in the report, if you found it useful?
> A. If it was useful, we'd have used it.

At the time of Dozier's Rule 32 testimony in 2000, six years had passed since the 1994 trial, and Dozier had no files from Wood's case because they were destroyed in a fire. Given the passage of time and lack of files, Dozier could not specifically recall reading Dr. Kirkland's report, but did testify, "I'm sure we did," as follows:

> Q. Did [Dr. Kirkland's] report provide anything for you all?
> A. I think it indicated that Holly Wood had some problems at a younger age or something like that. I just don't recall all this. But I think there was some childhood problems, something in the report.
> . . . .
> Q. Do you recall reading the Kirkland report before the trial?
> A. I don't recall. I'm sure we did, but I don't recall.

Trotter testified that "Dozier had indicated that he had looked at the report and that he didn't think anything in the report really merited . . . going further." Trotter emphasized: "And, again, he [Dozier] looked at the report and thought that wouldn't be needed." Dozier testified that he, Ralph, and Trotter had "a lot of correspondence" with Dr. Kirkland.

19

As to Wood's alcohol consumption on the day of the murder, Dozier recalled the trial team "considered presenting evidence that [Wood] was intoxicated at the time" and in fact "did bring out some testimony at the sentencing phase that [Wood] was intoxicated." The defense in the penalty phase introduced the arrest report for Ruby's murder, which indicated Wood had been drinking, and Trotter argued Wood's drinking and emotions about Ruby rejecting him were mitigating factors.

## B.    Ralph's testimony

Defense counsel Ralph had practiced law in Alabama for thirty years: twenty-five in private practice and the other five as an assistant attorney general. Ralph had handled fifty felony jury cases, and 25% of his practice was criminal cases. Ralph considered Dozier to be Wood's lead counsel. The case began before Ralph became involved, and Dozier had already met with Wood and "made perhaps some other interviews."[10]

While Ralph "didn't prepare the penalty phase," he "was in the penalty phase," and Ralph clarified that it was not "entirely correct" to say that he had "no involvement in the preparation for or investigation of the penalty phase." Ralph may have talked to Ruby's mother and Ruby's mother's boyfriend and believed he

_____

[10]Ralph admitted that if Dozier testified that Dozier participated in the penalty phase investigation along with Trotter, Ralph could not dispute that.

"talked to a sister or two" of Wood's "or maybe . . . a sister and [Wood's] father" prior to the penalty phase, in an effort to gain information for the penalty phase. Although Ralph never met with Dr. Kirkland, he was "sure" he reviewed Dr. Kirkland's report and "remember[ed] seeing it." Ralph recalled he and counsel "sat down and went over [Dr. Kirkland's report] and reviewed it."

Ralph explained counsel purchased, from an organization called "Capital Resources," a large book entitled "Handling Capital Cases in Alabama," which contained a great deal of information about "motion practice" and "techniques for handling various aspects of capital trials." Ralph testified that while he could not "say that [he] relied on it entirely . . . it was helpful."

## C. Trotter's testimony

Trotter was appointed as Wood's third attorney, to assist Dozier. Admitted to the Alabama Bar in 1993, Trotter had done "juvenile court work, some criminal defense, small claims, commercial litigation involving breach of contract issues, [and] some family law." Trotter's "understanding" was that he was appointed to assist the two senior attorneys who were considerably senior to him in experience. According to Trotter, Dozier was the principal attorney, and Dozier oversaw "all phases of the trial, including both . . . the sentencing and the guilt or innocence adjudication." Trotter testified that "Dozier made the determination that [Trotter]

21

would assist primarily with the penalty phase—preparation of the penalty phase." Although initially Dozier decided "Ralph . . . was to be more primarily responsible for the penalty phase," it was decided by either Dozier or Ralph "shortly before the trial . . . that [Trotter] would represent Mr. Wood during the penalty phase in the courtroom." Although Trotter testified he initially "didn't think that [they] were actually prepared to move forward with the penalty phase," Trotter explained that "after consultation with Mr. Dozier and Mr. Ralph . . . their concerns about that were alleviated. And at their direction, I went ahead and proceeded." Ralph testified that even though Trotter was relatively inexperienced and nervous about the case, Trotter's "apprehension was about being in front of a jury. It was not about his being prepared. I thought that he had done his work."

Trotter had "two levels of preparation" in representing Wood. First, he was assisting Dozier and Ralph, and was thereby able to "rely[] on their criminal law expertise and experience to help . . . them." Trotter explained that if he had issues or concerns, he would try to raise those issues or concerns with Dozier and Ralph "as to why I thought we were or were not prepared for something so they could give me feedback and guidance on how to proceed from that point." Trotter "was able to see issues but relied a lot on [Dozier and Ralph] for guidance as to how to resolve the issues." Trotter testified Dozier and Ralph essentially "made the

22

decisions and told [him] what [he] was going to do."[11]

Second, Trotter obtained a capital defense book published by either the Capital Resource Center or the Equal Justice Initiative, as well as various other resources, to "gain a greater understanding of capital punishment, a greater understanding of the procedures that lead up to the trial or the hearing, motions that might be necessary to preserve any appellate rights, things that we might . . . want to bring out at the trial in either phase." Trotter, Dozier, and Ralph all had copies of the capital defense book and a diskette with the types of motions typically filed in capital cases.

Trotter met with the investigator, Taylor, and reviewed Taylor's written reports to Dozier. However, Dozier was the "primary point of contact for Mr. Taylor, and he was the one that determined what would be investigated." Likewise, for motions, Trotter made a contribution, but Dozier was the ultimate decision maker.[12]

_____

[11]Our colleague's separate opinion suggests Trotter was not given assistance or supervised by Dozier and Ralph, but Trotter's own testimony contradicts that contention. Further, Dozier and Ralph were both present and active in the penalty phase, as recounted in Sections D and E, infra.

[12]At the time of Wood's trial, Alabama law provided that an indigent defendant facing the death penalty was to "be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law." Ala. Code § 13A-5-54 (1994). Both Dozier and Ralph had over twenty years' experience and met the requirements of § 13A-5-54. While Trotter was a new attorney, Trotter acknowledged that he was appointed to "assist" Dozier and Ralph. Alabama courts have made clear that as long as one of a defendant's appointed attorneys satisfies the requirements of § 13A-5-54, "the requirements of that section

Trotter spoke to "a lot of [Wood's] family" in preparing for the penalty phase. These family meetings were at the courthouse; "there were a number of occasions" on which Wood was brought to the courthouse and his family was present also; and "on some of those occasions at some point in time," Trotter interviewed the family. Trotter explained that through his interviews—in which Trotter tried to obtain information about Wood's "upbringing, his background, his childhood, what it had been like growing up in [Wood's] home, characteristics about [Wood], anything that [might] humanize [Wood] to make him seem more real to the jury; something that would make him seem more like a human being, somebody that would be worth saving even if that would mean he would spend his life in prison"—he identified the witnesses who were used at the penalty phase. Trotter "tried to get as much information as possible about [Wood's] background from the family."[13]

In preparing for the penalty phase, Trotter tried to contact people at the

---

have been satisfied." Hodges v. State, 856 So. 2d 875, 899 (Ala. Crim. App. 2001); see also Parker v. State, 587 So. 2d 1072, 1100-01 (Ala. Crim. App. 1991), aff'd, 610 So. 2d 1181 (Ala. 1992). The concurrence's suggestion that the Alabama law in § 13A-5-54 was not satisfied is unfounded.

[13]Ralph did not think Trotter "brought out enough of Mr. Wood's background through enough witnesses of the type of upbringing that he had," but Ralph could not recall which witnesses had left certain aspects of Wood's background "unsaid" and admitted his recollection was "vague." Further, three family members did testify in the penalty phase about Wood's upbringing, and Ralph never identified what specific additional evidence of Wood's upbringing should have been presented.

schools Wood attended, including Luverne High School, to obtain "[b]ackground information about what kind of student he was, what kind of person he'd been at the school . . . anything that would be able to be used as a mitigating factor." Trotter spoke to people at Luverne High, but was unable to obtain Wood's academic records because Luverne High did not respond to his subpoena and its staff was generally unhelpful.[14]

As to Dr. Kirkland, Trotter testified Dozier was the primary contact. Trotter recalled Wood was evaluated by a psychologist and a report was prepared. Trotter's fee declaration indicated he had a thirty-minute conversation with Dr. Kirkland in 1994. According to Trotter, Dozier would have initially reviewed Dr. Kirkland's report, and if "Dozier thought that [there] was something that [Trotter] should review or have, then he would give [Trotter] a copy . . . to review as well."

That Dozier made the penalty phase decisions is particularly shown by what happened in deciding whether to obtain another psychological evaluation of Wood beyond Dr. Kirkland's. After the jury trial, Trotter sent Dozier and Ralph a letter suggesting the possibility of moving for a continuance of the sentencing hearing before the trial judge in order to request another psychological evaluation.

---

[14]No academic or other records from Wood's high school days were even produced at the Rule 32 hearings. Instead, Wood's teachers testified at the Rule 32 hearings, without any records.

Trotter's letter noted to Dozier: "We have not had any independent psychological evaluations done since you said it would not be needed." Trotter explained that prior to the penalty phase, Dozier had determined that they did not need any further evaluations, and Dozier had determined that nothing in Dr. Kirkland's report merited going further, as follows:

> [O]n or about the time that we would have been having discussions with [Dr.] Kirkland . . . there may have been a discussion about whether we should do anything further and . . . Mr. Dozier had indicated that he had looked at the report and that . . . there was nothing in the report that merited going further. And so at that point, he determined that we didn't need any further evaluators and no further were called because in the course of my preparation for the penalty phase, I would read things about different psychological evaluations and had raised that to him. And, again, he [Dozier] looked at the report and thought that wouldn't be needed.

(Emphasis added.) While Trotter suggested an additional psychological evaluation, Dozier, as lead counsel, reviewed Dr. Kirkland's report and decided not to seek another evaluation. Trotter "relied upon Mr. Dozier's opinion of the psychiatry evaluation" by Dr. Kirkland.[15]

## D. Penalty phase before the jury

Although Dozier was lead counsel and made the trial strategy decisions, Wood bases his ineffective assistance claims mainly on Trotter's role in the penalty

---

[15]Trotter's testimony about Dozier's active and supervisory role in the penalty phase, along with similar testimony from Ralph and Dozier recounted supra, contradicts Wood's claim that Trotter was "without the assistance of the senior attorneys."

phase. Thus, we detail what happened in the penalty phase.

First, all three attorneys were present and participated in the penalty phase before the jury. Dozier handled various arguments, objections, and oral motions to the court on Wood's behalf, as well as the jury charges. Ralph also argued on Wood's behalf. Although Dozier and Ralph participated in the courtroom work, Dozier and Ralph had earlier decided Trotter would present the mitigation witnesses and argue to the jury. Dozier went over the penalty phase motions with Trotter.

On the morning the penalty phase began, the trial court handled three matters before the jury was brought in. The first matter was the State's notice of aggravating circumstances. Dozier and Ralph argued the State failed to give proper notice of one of the aggravating circumstances—that Wood committed the murder after being convicted of a crime of violence. The trial judge denied Dozier's motion to exclude that aggravating circumstance.

The second matter was the pre-sentencing report to be prepared for the trial judge after the jury made its sentencing recommendation. Trotter reminded the trial judge that in May 1994, Dr. Kirkland produced his evaluation of Wood and Dr. Kirkland's report indicated Wood had "a history of antisocial behavior and problems with anger control." Trotter told the trial judge: "[W]e don't intend to

introduce [the Kirkland] report today to the jury." (Emphasis added.) While all counsel had Dr. Kirkland's report, Dozier had made the decision not to use the report with the jury and not to seek another psychological evaluation.

However, Trotter also told the trial judge that "[n]o further investigation ha[d] been done, psychologically, of those points" and Trotter asked the judge that, prior to the court's final sentencing verdict, there be further psychological evaluation done of Wood. The trial judge stated he would consider Trotter's request after the jury was released, and pointed out that under the governing statute, the trial judge sets a date for sentencing after the jury's recommendation and only then orders the filing of the pre-sentencing report.

The third matter involved Trotter advising that Wood's counsel had not received records from the Board of Pardons and Paroles, the state prisons, and the Department of Human Resources. The State responded that a Pardons and Paroles clerk was under subpoena to testify, and the State had no objection to letting Wood's counsel look through Wood's parole file, which the clerk was bringing to the hearing. The court ruled Wood's counsel would have access to the clerk's file during a break in the penalty phase and further ruled that, if necessary and upon request, Wood's counsel could also have access to Wood's parole officer's file.

The trial court asked the defense if it was ready to proceed, and Dozier

28

responded the defense was ready. The jury was brought in, and each side gave opening statements. Trotter gave the opening statement for Wood, stressing the option of life without parole. Trotter advised the jury, inter alia, that the defense would present evidence to show there were ample reasons to return an advisory verdict of life imprisonment without parole.

The State put on its case for aggravating factors, introducing a certified copy of Wood's prior conviction for first-degree assault. The Pardons and Paroles clerk testified Wood was on parole when he murdered Ruby. Another witness testified the District Attorney had recommended against Wood's parole.

The State attempted to call Siler, the victim in Wood's prior assault conviction, and Trotter objected. Trotter argued that the details of Wood's crime against Siler were unduly prejudicial. The court sustained Trotter's objection and refused to allow the State to present Siler's testimony regarding the specific details of Wood's assault against her. The State rested.

Trotter's success in keeping out Siler's testimony was significant. While the jury knew Wood had a prior assault conviction for shooting his girlfriend, the jury did not know the circumstances of that shooting and Ruby's murder were the same, which would have established Wood's killing of Ruby was highly premeditated and aggravated. The State wanted to show Wood suspected Siler was seeing

29

another man, snuck around Siler's house, and attempted to kill her at her own home by shooting her through a window. In both shootings, Wood suspected his girlfriends were seeing other men, snuck around their residences, and shot them out of jealousy at their own homes. This striking similarity would have undermined Wood's mitigation claim that he shot Ruby only in the heat of passion and due to alcohol.

After keeping Siler's testimony out, Trotter called three mitigation witnesses to show the very difficult childhood and many hardships Wood had suffered, and to illustrate how Wood, despite these extreme hardships, was a good, responsible brother and son who worked tirelessly to help support his five sisters and was a leader in their family life. The defense team portrayed Wood as a responsible person whose life was worth saving and showed Wood was despondent and drinking because Ruby rejected him, as opposed to a heartless, cold-blooded murderer.

The primary mitigation witness was Wood's oldest sister Johnnie, who portrayed their difficult childhood and how Wood was, nevertheless, extremely responsible and hardworking. According to Johnnie, their mother died when Wood was ten years old. Johnnie explained that after their mother died, they stayed with a cousin for approximately four years, and after that, she (Johnnie)

30

raised Wood and their four sisters. Johnnie testified that after their mother died, but before they moved out of their cousin's house, their brother Samuel was killed in a car accident.

Johnnie testified that when Wood turned fifteen, he quit school and got a job at the Pepsi-Cola plant "in order to . . . help provide for the household, because we didn't have any help or nothing like that." According to Johnnie, Wood quit school to provide for the household "because he was the only son that was there and we needed a lot of things by the other kids growing up." Wood gave Johnnie money from his job to buy groceries and cleaning supplies. Johnnie explained Wood bought a car for the family "in order to provide for us to have a way to go back and forward to the store in order to get groceries." The car cost about $200, and after making a down payment of approximately $100, Wood paid money on the car every two weeks.

Johnnie stressed Wood was "a leader" in the family even though he was younger than Johnnie and other siblings. Johnnie emphatically told the jury: "if it hadn't been for [Wood] . . . providing for [the family,] I don't know where we would have been at."

Wood's father, J.P. Wood, and Wood's other older sister, Lillie Jean Wood, also testified. Lillie Jean explained she was close with her brother and was scared

31

that he might receive the death penalty. Lillie Jean stated she "always had [Wood] to look up to" and could "ask him for something and he wouldn't ever say no." J.P. Wood testified Wood was a "good boy" and a "good son." He also testified that when Wood was a child, he helped with chores around their farm.

Wood's counsel recalled the Pardons and Paroles clerk to establish Wood's parole file contained the arrest report and the report stated Wood was drinking at the time of the arrest. During the guilt phase, there was also testimony that Wood was drinking during the day and night of Ruby's murder.

Before closing arguments, the trial court held a hearing in chambers, in which Dozier argued the State had failed to prove the alleged aggravating circumstances. Dozier moved to strike the aggravating circumstances on that ground and also as not being alleged in the indictment. The trial court denied Dozier's motion. The court then discussed the jury charges. Dozier, and to some extent Ralph, handled the arguments about the jury charges.

In its closing statement, the State argued it had established three aggravating factors: (1) Wood murdered Ruby during a burglary; (2) Wood had a prior conviction for a violent felony; and (3) Wood murdered Ruby while on parole.

In reply, Trotter's closing argument emphasized the jury could consider not only the mitigation evidence from the penalty phase, but also all the trial evidence

32

about the circumstances of the crime, including Wood's alcohol consumption on the night of the murder and that Wood was a good son and brother who dropped out of school to work and to help support his family. Trotter reviewed Wood's very difficult childhood, emphasizing Wood was ten when his mother died and had to move in with his cousin and live in a sixteen-person house for four years. Trotter stressed how Wood left school to make money to support his five sisters.

In addition to the hardships in Wood's life, Trotter argued there were mitigating circumstances surrounding the crime, and this was not a case of cold-blooded murder. Trotter argued that Ruby was the mother of Wood's child, and that Wood loved Ruby but she rejected him. Trotter emphasized that the more Wood drank on the day of the murder, the more he thought about Ruby and not seeing his child, and his reasoning was clouded by those emotions and his alcohol consumption. As Trotter summarized, Wood lost his mother at age ten, and now his girlfriend and the mother of his child were rejecting him too. Trotter asked the jury to consider all the childhood difficulties and the emotional factors that brought Wood to the point where he was on the night of the murder. Although alcohol was not a defense to Wood's crime, Trotter argued it was a strong mitigating factor, especially since Wood had been drinking all day up until the crime.

The State made a rebuttal closing argument to the jury. Dozier objected to

part of the State's rebuttal, but the trial court overruled Dozier's objection.

The trial court, <u>inter alia</u>, instructed the jury about mitigating factors and read a list of statutory mitigating factors that the jury could consider, including: (1) whether the capital felony was committed while Wood was under extreme emotional disturbance; and (2) whether Wood's capacity to conform his conduct to the requirements of law was substantially impaired. The trial court told the jury the latter mitigating circumstance would exist even if the defendant appreciated the criminality of his conduct, as long as his capacity to conform to the law was substantially impaired. The trial court explained that this was so because "a person may appreciate his actions [are] wrong and still lack the capacity to refrain from doing them."

The trial court's instructions made it clear that "[e]vidence of a difficult family history and of emotional disturbance constitutes relevant mitigating evidence." The trial court instructed the jury that the list of statutory mitigating factors was non-exhaustive and that "mitigating circumstances shall include any aspect of [the] defendant's character, or record or any of the circumstances of the offense that defendant offers." The jury recommended a death sentence by a vote of 10-2.

E.    **Penalty phase before the state trial judge**

Approximately one month later, the trial court held a sentencing hearing. The court and counsel reviewed the pre-sentencing report. Dozier made numerous objections to errors and omissions in the pre-sentencing report, and Trotter lodged objections too. The trial court sustained most objections. The pre-sentencing report included two psychological evaluations for consideration by the sentencing judge:[16] (1) Dr. Kirkland's May 1994 report; and (2) a June 1992 evaluation by the office of Dr. Harry A. McClaren, Ph.D.[17]

After the State argued, Dozier presented the initial argument for Wood and contended the facts were not sufficient to support a death sentence. Dozier stressed that Wood and Salter had been drinking all day on the day of the murder, and that Wood came to Troy, Alabama to find his girlfriend and shot her only in the heat of passion. Trotter then emphasized Wood's difficult family history: he lost his mother when he was ten; he had no father figure in his home; and he was raised by various members of the family, including his older sister. Trotter stressed Dr.

---

[16]A week before the judge rendered his final sentence, Trotter specifically verified before the trial judge that "the psychological reports . . . [were] attached as part of the record" to Wood's pre-sentencing report.

[17]In June 1992, Wood was evaluated by Michael T. D'Errico, Ph.D., a Certified Forensic Examiner in Dr. McClaren's office. The report is on Dr. McClaren's stationery but signed by Dr. D'Errico. Because the Rule 32 orders tend to refer to this evaluation as Dr. McClaren's report, we do the same for clarity. Dr. McClaren's report is consistent with Dr. Kirkland's report, and as discussed later, both reports are consistent with the two Rule 32 psychologists' testimony.

35

Kirkland's conclusion that Wood could not "use abstraction skills much beyond the low average range of intellect, and that he [was] at most functioning in the borderline range of intellectual functioning," and Trotter emphasized Wood's anger control and antisocial behavior problems.

A week later, the trial judge sentenced Wood to death. The judge found Wood was not "under the influence of extreme mental or emotional disturbances" at the time of the murder and had "the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law." The trial court noted defense counsel had asked the court to consider Dr. Kirkland's report, and observed that the report showed Wood was functioning in the borderline range of intellect but did "not have a mental disorder present that would detract from his ability to appreciate the criminality of his behavior."

The trial court observed that the jury was charged as to the relevant aggravating and mitigating circumstances. The trial court further noted that both defense counsel and the State were satisfied with the jury charge as given. As to aggravating circumstances, the trial court found, inter alia, that: (1) the capital offense was committed while Wood was under a sentence of imprisonment; (2) Wood was previously convicted of a violent felony; and (3) the capital offense was committed while Wood "was engaged in the commission of or an attempt to

36

commit or flight after committing . . . burglary in the first degree." As to mitigating circumstances, the trial court found none, and noted Wood was not under the influence of extreme mental or emotional disturbance during the commission of the capital offense and Wood had the capacity to appreciate the criminality of his conduct and to conform his conduct to the law. The trial court concluded, "beyond a reasonable doubt," that the aggravating circumstances "far outweigh[ed]" any evidence of mitigating circumstances "in all regards" and were "sufficient in both quantity and quality to more than uphold the jury's verdict recommending the death penalty."

## F. Rule 32 proceedings between 2000 and 2003

After Wood's death sentence was affirmed on direct appeal, Wood filed his Rule 32 petition for post-conviction review. Between 2000 and 2003, there were three evidentiary hearings, and the Rule 32 court entered three orders denying Wood's claims. The second order repeated some of the first order's findings and conclusions and added to them, and the third order did the same. We already recounted the Rule 32 testimony from Wood's counsel, school teachers, Siler, Wright, and psychologists McClaren and Prichard. The Rule 32 court also considered testimony from Wood's sisters, which we now review. We then summarize the three Rule 32 orders.

In her testimony, Wood's sister Maeola detailed their strict upbringing and how after their mother died, they lived with a half-sister, Nellzena, and a cousin. According to Maeola, Nellzena was very strict and would whip the children with an extension cord for hours whenever they did something wrong. Maeola testified that after Nellzena left, Wood and Johnnie fought with some frequency; Wood did not listen to Johnnie; and Wood was kicked out of school and did not leave school to support the family.[18] The Rule 32 court found Maeola's testimony "less than credible."

Johnnie corroborated Maeola's testimony about their strict upbringing and agreed Nellzena was strict. However, Johnnie testified Nellzena did not hit them regularly and would instead "mostly punish." Nellzena would punish Wood by making him clean up the backyard, not allowing him to play after school, grounding him, or forbidding him to have company. Their mother whipped Wood for wetting the bed, a problem that he had until he was fourteen or fifteen, but she "never hurt" them and did not physically abuse them. Johnnie's testimony at the Rule 32 hearing is consistent with Dr. Kirkland's statement that Wood "denies any sexual or physical abuse . . . [or] history of criminal victimization."[19]

---

[18]Maeola acknowledged that Johnnie "would probably know better" if she testified differently.

[19]As the district court concluded, Wood has not shown ineffective assistance as to counsel's investigation of his childhood. Johnnie testified extensively at trial about Wood's

We now turn to the three Rule 32 orders, which addressed Wood's ineffective assistance claims at length. As to pre-trial investigation, the Rule 32 court found Dozier and Ralph were "very experienced attorneys," and Trotter, although "very inexperienced," was to assist Dozier and Ralph and benefitted from their experience. Trotter "was assistant to Mr. Dozier and Mr. Ralph"; relied on their criminal law experience to help him assist them; and obtained books and had discussions to gain a greater understanding of what they might want to bring out at the trial in either phase.

The Rule 32 court found Wood's trial counsel requested the psychological evaluation rendered by Dr. Kirkland in May 1994, and Wood's trial team corresponded frequently with Dr. Kirkland. The Rule 32 court found: (1) counsel employed the services of a private investigator—Taylor—who prepared reports used in Wood's defense; (2) Trotter met with Wood's family to prepare for the penalty phase and attempted to gather information about Wood's upbringing, background, and childhood, in order to humanize Wood in the jury's eyes; (3) counsel contacted and attempted to get information from Wood's schools, the Alabama Department of Pardons and Paroles, the Alabama Department of

difficult childhood and poverty, and most of the Rule 32 evidence from Maeola was cumulative. See Glock v. Moore, 195 F.3d 625, 636 (11th Cir. 1999). To the extent there was any difference between Johnnie's and Maeola's testimony, the Rule 32 court found Maeola's testimony to be "less than credible."

39

Corrections, and the Alabama Department of Human Resources; (4) counsel sought guidance from the Capital Resource Center and the Southern Poverty Law Center; (5) Wood's father and two sisters testified at the penalty phase; and (6) evidence was presented suggesting Wood suffered from an emotional disturbance. Trotter investigated Wood's educational background to some extent and "trial counsel met with Wood's family on several occasions to discuss possible mitigating evidence."

As to Dr. Kirkland's pre-trial report, the Rule 32 court observed that it stated Wood: (1) was "cooperative, attentive, and interested in the evaluation process"; (2) was "neatly dressed" and had good hygiene; (3) had a "normal thought process"; (4) exhibited "goal-directed and logical" thinking; (5) "evidenced a normal affect"; (6) "did not evidence any memory deficits"; (7) "evidenced concrete reasoning ability" and could use "abstraction skills" at the "low average range of intellect," despite "functioning, at most, in the borderline range of intellectual functioning"; (8) had "a good relationship with his attorneys" and was "able to discuss his case in detail with [them]"; and (9) "had a complete memory of his behavior" at the time of the murder.[20]  Dr. Kirkland's report concluded: (1)

[20]Wood told Dr. Kirkland: (1) "I don't need this evaluation—I've got plenty of sense—I'm not crazy I never have been"; (2) he had benefitted from reading the Bible and law books in prison, and (3) he had in fact increased his knowledge of the judicial process by reading law books.

Wood had no "mental disorder present that would detract from his ability to appreciate the criminality of his behavior with regard to this specific alleged instant offense" of murder; (2) "[t]here is no allegation of any mental disorder factors in the explanation of thought or behavior process variables at all on the day of the alleged offense"; and (3) "[r]eview of collateral data and interview data . . . do[es] not reveal the presence of a mental disorder that would bear any causal relationship to [Wood's] alleged behavior on the day of the offense."

The Rule 32 court specifically found that counsel decided calling Dr. Kirkland was not in Wood's best interest, and "counsel investigated a potential mental health defense, but decided against presenting it." The Rule 32 court observed that counsel's decision "was based on at least one mental health evaluation, and most probably two,"[21] and found that as very experienced attorneys, Dozier's and Ralph's decision not to raise a mental deficiency issue at Wood's trial was due great deference. Dozier testified he was "positive that he reviewed Dr. Kirkland's report," and counsel "would have used anything in Dr. Kirkland's report that was helpful to them."

The Rule 32 court concluded Wood had the burden of proving counsel's decision to not call Dr. Kirkland was unreasonable and "Wood failed to establish

_____

[21]The Rule 32 court noted Dr. McClaren conducted a forensic psychological evaluation of Wood in June 1992.

41

that what trial counsel did in preparation and investigation for the penalty phase was unreasonable." The Rule 32 court noted Wood did not question his trial counsel at the Rule 32 hearings "as to the reasoning behind the strategy employed, [the] witnesses called to testify and those who were not asked to give testimony," which yielded a silent record and a strong and continuing presumption of reasonable professional judgment. As to Dr. Kirkland specifically, the Rule 32 court observed that "[b]ecause Wood did not ask Attorneys Ralph or Dozier about this matter, the record is silent as to why they did not call Dr. Kirkland as a witness." The Rule 32 court found Wood's trial counsel made a decision not to call Dr. Kirkland and that the silent record created a presumption that experienced counsel exercised sound judgment in not calling Dr. Kirkland.

The Rule 32 court also found counsel were not unreasonable in not obtaining an additional psychological evaluation beyond Dr. Kirkland's. Counsel "thoroughly reviewed Dr. Kirkland's report and determined that nothing in that report merited further investigation"; "Wood's counsel made a reasonable judgment that another mental evaluation was not necessary"; and, in light of the fact that Wood's counsel were "very experienced attorneys," "reasonable counsel could have decided against seeking another mental health evaluation, in order to prepare other, more promising, defenses for trial." The Rule 32 court specifically

42

found that Trotter testified Dozier was the primary contact person for Dr. Kirkland and the trial team "did not request another psychological evaluation of Wood because Mr. Dozier thoroughly reviewed Dr. Kirkland's report and decided that nothing in the report merited further inquiry."

Alternatively, the Rule 32 court concluded Wood had not established prejudice. The Rule 32 court found "Wood did not demonstrate a reasonable probability that but for counsel's allegedly unprofessional errors, the result of the proceeding would have been different." Even if Wood's counsel had presented evidence concerning his impaired intellectual functioning, there was no reasonable probability that the balance of aggravating and mitigating factors that led to the imposition of the death penalty would have changed, and "nothing in the evidence presented during the evidentiary hearing established that some portion of the defendant's character or record . . . served as a basis for a sentence of life imprisonment without parole rather than death." In light of the fact that Wood brutally murdered Ruby while she was asleep in her bed in her own home, there was no reasonable probability that the presentation of evidence concerning Wood's mental deficiencies would have changed the jury's 10-2 recommendation of a death sentence or the finding that the aggravating circumstances outweighed the mitigating circumstances.

43

## G.     2004 Rule 32 appeal

In 2004, the Alabama Appeals Court affirmed the Rule 32 court's denial of Wood's petition.  Wood v. State, 891 So. 2d at 420.  The Alabama Appeals Court rejected Wood's claim that his trial counsel were ineffective by failing to "investigate and present sufficient mitigating evidence during the penalty phase," and expressly adopted and agreed with the Rule 32 court's extensive fact findings and conclusions that Wood failed to establish deficient performance and prejudice under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  Wood v. State, 891 So. 2d at 414, 418-19.  The Alabama Appeals Court concluded "counsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence" and "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation."  Id. at 416 (quotation marks and citations omitted).  The Alabama Appeals Court noted, "[t]here has never been a case where additional witnesses could not have been called."  Id. (quotation marks and citation omitted).

## H.     District court's § 2254 order

Wood then filed a § 2254 petition.  The district court's § 2254 order noted this is "not a case . . . in which counsel failed to investigate, obtain, or present any mitigating evidence to the sentencing jury.  Instead, this is a case in which at least

44

some evidence was investigated and presented." Wood v. Allen, 465 F. Supp. 2d at 1239. The district court pointed out that evidence of Wood's difficult childhood and poverty was presented to the jury, and concluded there was no ineffective assistance as to those mitigation issues. Id.

However, the district court granted Wood's § 2254 petition based on trial counsel's failure to investigate and present evidence of Wood's impaired intellectual functioning. Id. at 1245. The district court noted "Wood's three trial counsel" actually possessed Dr. Kirkland's report, which showed that Wood "'is functioning, at most, in the borderline range of intellectual functioning'"; "'could not use abstraction skills much beyond the low average range of intellect'"; and "reads on a third grade level." Id. at 1240. The district court concluded that counsel should have put before the jury evidence of Wood's "'borderline range of intellectual functioning,'" as identified in Dr. Kirkland's report. Id. at 1243. The district court also concluded defense counsel failed to investigate further Wood's intellectual functioning, such as by interviewing Wood's teachers or seeking an evaluation beyond Dr. Kirkland's. Id. As to prejudice, the district court found there was a reasonable probability that evidence of Wood's intellectual functioning, even if not enough to establish mental retardation, would have established a mitigating circumstance and was sufficient to undermine confidence

45

in the outcome. Id. at 1245. This appeal followed.

## I. Performance prong: presentation of mental health evidence

On appeal, the State contends the district court erred in concluding that the Alabama courts' rejection of Wood's ineffective assistance claims was an unreasonable application of clearly established federal law. We review the established federal law and then explain how the Alabama courts' decision was fully consistent with that law.

To establish ineffective assistance, Wood must show: (1) counsel's performance was deficient; and (2) that deficiency prejudiced him. Strickland, 466 U.S. at 687-92, 104 S. Ct. at 2064-67. Counsel's performance is deficient when it falls "below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. The test for reasonableness is not whether counsel could have done something more or different. Instead, Wood must show counsel's performance fell "outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066. Furthermore, "omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987)).

Courts conduct a highly deferential review of counsel's performance and

"'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (alteration in original) (quoting Strickland, 466 U.S. at 689-90, 104 S. Ct. at 2065-66); see also Williams v. Head, 185 F.3d 1223, 1227 (11th Cir. 1999) (same). "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler, 218 F.3d at 1316. Because of this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: "[P]etitioner must establish that no competent counsel would have taken the action that his counsel did take." Id. at 1315.

This is not a case where counsel failed to present any mitigation evidence. Counsel hired an experienced investigator (Taylor) to help gather mitigation evidence and presented mitigation evidence from three family members about Wood's difficult childhood and poverty. For example, the jury was aware that Wood lost his mother at age ten, had no father figure in his home, and had to live in a house of sixteen people. The jury knew Wood quit school at age fifteen to take a job to provide groceries and essentials for his five sisters. Despite these hardships, Wood was a good, responsible brother and son; was the leader of the family; and worked tirelessly to support his five sisters. Counsel also presented the

47

arrest report showing Wood was drinking on the day of the murder and argued Wood was distraught over Ruby leaving him.

This is also not a case where counsel failed to discover prior physical or sexual abuse or prior mental hospitalizations, treatment, or medication. In fact, Wood had none of these things.

Nor is this a case where counsel failed to obtain any mental evaluation or did not know about the mental condition in issue. Wood's counsel procured a mental evaluation by Dr. Kirkland to "discover or get a lead on some possible mitigation evidence." Dr. Kirkland's May 1994 report expressly stated Wood had "an IQ in the borderline range of intellectual functioning," was "reading on a 3rd grade level," and "could not use abstraction skills much beyond the low average range of intellect." Counsel had read Dr. Kirkland's report, knew about Wood's intellectual functioning, and decided not to present that evidence.

Thus, this appeal is about whether not telling the jury about Wood's low intellectual functioning—shown clearly in Dr. Kirkland's pre-trial report—was ineffective assistance. The state courts expressly found: (1) "counsel decided that calling Dr. Kirkland would not be in Wood's best interest"; and (2) "counsel investigated a potential mental health defense, but decided against presenting it." Applying Strickland, the state courts concluded that counsel's decision—not to call

48

Dr. Kirkland and not to present Wood's mental deficiencies to the jury—was not deficient performance.

For several reasons, Wood has not established that the state courts' decision was contrary to, or an unreasonable application of, established Supreme Court precedent or based on an unreasonable determination of the facts. First, the Rule 32 evidence amply supports the state courts' fact findings.[22] Very experienced counsel Dozier and Ralph had Dr. Kirkland's report revealing Wood's mental deficiencies but did not give it to the jury or have Trotter give it to the jury. Dozier was the primary contact with Dr. Kirkland and had a lot of correspondence with him, and even Trotter specifically testified that Dozier had reviewed Dr. Kirkland's report. While Dozier had no files left and could not recall the details of Dr. Kirkland's report six years later, he was sure they would have used anything useful in the report. Moreover, at the start of the penalty phase, Dozier and Ralph were present in court when Trotter expressly told the trial judge, on the record and on behalf of the trial team, that Dr. Kirkland had evaluated Wood and counsel did not intend to introduce Dr. Kirkland's report to the jury. Trotter testified that Dozier reviewed Dr. Kirkland's report and decided nothing merited going further. And

_____

[22]Whether counsel made a decision "regarding what evidence to put forth at sentencing is a question of fact." Jackson v. Herring, 42 F.3d 1350, 1366 (11th Cir. 1995); see also Gaskin v. Sec'y, Dep't of Corr., 494 F.3d 997, 1003 (11th Cir. 2007).

49

Dozier and Ralph, as experienced counsel, were present in court during the entire penalty phase. The evidence amply supports the state courts' fact findings that experienced counsel (1) decided calling Dr. Kirkland would not be in Wood's best interest, and (2) decided against presenting mental health evidence. Wood has wholly failed to show the state courts made an unreasonable determination of the facts.[23]

Second, Wood has not shown counsel's decision—not to call Dr. Kirkland to testify about Wood's mental deficiencies—fell below an objective standard of reasonableness. Chandler, 218 F.3d at 1312. After finding counsel decided calling Dr. Kirkland would not be in Wood's best interest, the Rule 32 court pointed out the record was silent as to counsel's particular reasoning behind that best-interest decision. The state courts concluded: (1) Dozier and Ralph were very experienced attorneys; (2) "a silent record creates a presumption that trial counsel exercised sound professional judgment" in not presenting Dr. Kirkland's evidence of Wood's

---

[23]At a minimum, Wood has not presented evidence, much less clear and convincing evidence, that counsel did not make such decisions about Dr. Kirkland's report and a mental health defense. See Bolender v. Singletary, 16 F.3d 1547, 1558 & n.12 (11th Cir. 1994) (holding that "state court findings of historical facts made in the course of evaluating an ineffectiveness claim," such as the state court's finding that defense counsel was aware of defendant's general background, were entitled to presumption of correctness). Our colleague's separate opinion basically conducts de novo review and cherry picks certain statements to support its conclusions, rather than examining whether there is evidence to support the state courts' findings. The main difference between the opinions is that the majority applies the required AEDPA deference but the separate opinion does not.

mental deficiencies; and (3) Wood did not ask Dozier or Ralph about the matter, and thus Wood failed to carry his burden of showing counsel's decision—not to call Dr. Kirkland and present evidence of Wood's mental deficiencies—was objectively unreasonable.

The state courts correctly followed Chandler, which instructs: (1) "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment"; and (2) "an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption," such that "where the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." Chandler, 218 F.3d at 1314 & n.15 (quotation marks, brackets, and citations omitted). Dozier and Ralph were very experienced counsel and their professional judgment is entitled to a presumption of reasonableness under Strickland and Chandler.

Wood has not presented any evidence to rebut the presumption that experienced trial counsel's decision—not to call Dr. Kirkland and not to present mental health evidence—was reasonable. It was not the State's burden to elicit from Dozier, Ralph, or Trotter the reason why Dr. Kirkland's report of Wood's

51

mental deficiencies was not presented to the jury in the penalty phase. Instead, it was Wood's burden to rebut the presumption of reasonableness with evidence, which he wholly failed to do.[24]

Even ignoring this strong presumption that experienced trial counsel exercised reasonable professional judgment, counsel's decision to present less than all available potential mitigation evidence was still not deficient performance. As the State points out, Dr. Kirkland's report contained information harmful to Wood, such as: (1) Wood's statement to Dr. Kirkland denying he drank alcohol on the day of Ruby's murder, which would have undercut Wood's defense that he was distraught and drinking heavily that day; (2) Dr. Kirkland's description of how Wood shot his prior girlfriend Siler through the window of her own residence after seeing her with another man, which Trotter had kept from the jury by successfully objecting to Siler testifying in the penalty phase; and (3) Wood's nineteen prior

---

[24]In Callahan v. Campbell, 427 F.3d 897, 922, 934 (11th Cir. 2005), this Court applied Chandler's ruling—that a silent record will not rebut the strong presumption that counsel exercised professional judgment—in denying § 2254 relief for claims based in part on counsel's failure to procure and present expert mitigation evidence of the defendant's "mild cognitive deficit" and "paranoid personality disorder." The attorney had died, and there was no testimony from him. Callahan, 427 F.3d at 933. In denying relief, this Court presumed "the attorney 'did what he should have done'" and "'exercised reasonable professional judgment,'" and held the burden is on the defendant to prove his trial counsel did not take the necessary steps in the penalty phase. Id. (citation omitted).

This case is stronger than Callahan for triggering the presumption of reasonable professional judgment, because Dozier testified he would have used what was in Dr. Kirkland's report if Dozier had found it useful, and Trotter testified Dozier reviewed Dr. Kirkland's report and decided nothing merited going further.

52

arrests between 1981 and 1984.[25] If Dr. Kirkland had testified about Wood's mental deficiencies, this damaging information likely would have been brought out on cross-examination or in rebuttal.[26] Further, if Dr. Kirkland had testified, the jury would have learned that Wood—despite his borderline intellectual functioning—had a high level of adaptive functioning; Wood had a complete memory of his behavior at the time of the murder; there was no causal relationship between Wood's mental condition and his behavior on the day of the murder; and Wood had no mental problem that detracted from his appreciation of the criminality of his behavior when he snuck into Ruby's house with a loaded shotgun and killed her in her bed. Additionally, presenting evidence of Wood's mental deficiencies, special education classes, and third-grade reading level might have suggested Wood left school for those reasons and not only because he had to work and support his five sisters financially.

"[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's

---

[25]While many of these offenses were traffic violations (including arrests for reckless driving, reckless endangerment, driving without a license, and four arrests for speeding), Dr. Kirkland's report also reflected that Wood had more serious prior arrests, including an arrest for harassment, three separate arrests for theft of property, and an arrest for criminal possession of a forged instrument. See also infra note 34.

[26]As discussed in the prejudice section infra, if Wood's counsel had presented mental health evidence through the Rule 32 witnesses, Dr. Kirkland's report (and the harmful information therein) would have been introduced by the State.

strategy.  Counsel must be permitted to weed out some arguments to stress others and advocate effectively."  Haliburton v. Sec'y for the Dep't of Corr., 342 F.3d 1233, 1243-44 (11th Cir. 2003) (quotation marks and citations omitted); see Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1348-50 (11th Cir. 2005) (rejecting ineffective assistance claim where defendant's mother was only mitigation witness and counsel did not introduce evidence from hospital records in counsel's possession showing defendant's brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence); Hubbard v. Haley, 317 F.3d 1245, 1254 n.16, 1260 (11th Cir. 2003) (stating this Court has "consistently held that there is 'no absolute duty . . . to introduce mitigating or character evidence'" and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in "borderline mentally retarded range") (brackets omitted) (quoting Chandler, 218 F.3d at 1319) .

Our decision in Hubbard is particularly instructive as to why it was not deficient performance for counsel not to present evidence of Wood's low IQ. Hubbard claimed his trial counsel were ineffective for failing to introduce, as mitigation evidence, hospital records that showed his "verbal I.Q. of 77 and a full scale I.Q. of 80—both in the borderline mentally retarded range"—and his history

54

of alcoholism. 317 F.3d at 1254 n.16, 1260.[27] The post-conviction state court concluded any evidence of Hubbard's mental state would have been more than offset by reports that determined Hubbard had not suffered from any mental disease or defect at the time of the murder. Id. at 1260. Similarly, Dr. Kirkland's report concluded Wood had borderline intellectual functioning but still had a complete memory of his behavior at the time of the murder and fully appreciated the criminality of his conduct.

For all these reasons, Wood has not shown the state courts' conclusion—that his counsel were not ineffective in not calling Dr. Kirkland and presenting mental health evidence—was contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

### J.    Performance prong: additional investigation

Wood also claims: (1) his counsel did not conduct a thorough investigation and were ineffective on this basis alone; and (2) Dozier's decision—not to call Dr. Kirkland about Wood's mental deficiencies—was not based on a thorough enough investigation and cannot be considered reasonable.

---

[27]Like Wood's case, Hubbard's attorneys did not present reports showing Hubbard's IQ in the borderline mentally retarded range, but instead relied "at sentencing on previously admitted evidence regarding Hubbard's habit of drinking and his intoxication on the morning of the murder, arguing to the jury that these factors mitigated the crime." Hubbard, 317 F.3d at 1260 & n.25.

The Supreme Court has instructed that (1) strategic choices made after "'thorough investigation[s]'" are "'virtually unchallengeable,'" and (2) counsel has a separate duty under Strickland "'to make reasonable investigations.'" Wiggins v. Smith, 539 U.S. 510, 521-23, 123 S. Ct. 2527, 2535-36 (2003) (quoting Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066). The Supreme Court has explained counsel's investigatory duty as follows:

> "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

Id. at 521-22, 123 S. Ct. at 2535 (emphasis added) (brackets omitted) (quoting Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066). Here, the issue becomes: Did counsel, before deciding not to present evidence of Wood's borderline intellectual functioning, make "reasonable investigations" or "a reasonable decision that ma[de] particular investigations unnecessary?" Id.

As to counsel's investigation, the state courts found that while Wood claimed "more should have been done," the record belied that conclusion. The Rule 32 court found: (1) counsel employed investigator Taylor, who met with

56

Wood's family members to seek out mitigation evidence; (2) counsel met with Wood's family on multiple occasions to discuss possible mitigation evidence; (3) counsel moved for and obtained a psychological evaluation from Dr. Kirkland prior to trial; (4) Trotter met with Wood's family and gathered information about Wood's childhood, upbringing, background, and characteristics in order to humanize Wood before the jury; (5) counsel attempted to get information from Wood's schools and various Alabama institutions where Wood might have spent time; (6) counsel sought guidance from capital defense organizations; (7) Wood's father and two sisters testified at the penalty phase; and (8) counsel presented evidence of an emotional disturbance. These findings are amply supported by the record, as discussed.

Indeed, it is undisputed that counsel knew about Wood's low IQ, borderline intellectual functioning, and third-grade reading level, because it was included in Dr. Kirkland's report. The Rule 32 psychologists' evaluations essentially agreed with Dr. Kirkland's assessment as to Wood's intellectual functioning and did not reveal any new mental diseases or disorders. The state courts specifically found counsel investigated a potential mental health defense, but decided against presenting it. The Rule 32 court concluded "that Wood failed to establish that what trial counsel did in preparation and investigation for the penalty phase was

unreasonable."[28]

As to obtaining additional psychological evaluations beyond Dr. Kirkland's, Trotter testified that "Dozier had indicated that he had looked at the report," "there was nothing in the report that merited going further," and "at that point, he [Dozier] determined that we didn't need any further evaluators." Thus Dozier decided no further psychological evaluations were needed. The state courts concluded Wood did not show that no reasonable attorney would have failed to ask for an additional mental health evaluation beyond Dr. Kirkland's; emphasized that Dozier was a "very experienced attorney[]"; and concluded that Wood had not shown Dozier's decision about further evaluations was unreasonable. The fact that no different mental health information was revealed further shows that Dozier's

---

[28]To the extent Wood relies upon Wiggins, that case is materially distinguishable in numerous respects. Wiggins's counsel failed to investigate personal or social history, despite Wiggins's own description of his childhood as "disgusting," and thereby never discovered that Wiggins had suffered severe sexual and physical abuse throughout a horrific childhood in foster homes and on the street. Id. at 516-17, 523-25, 123 S. Ct. at 2533, 2536-37. The penalty phase defense focused solely on Wiggins's claim he had not actually killed the victim; counsel presented no evidence of Wiggins's life history or family background. 539 U.S. at 515, 123 S. Ct. at 2532. The Supreme Court emphasized that the new post-conviction evidence of Wiggins's prolonged sexual and physical abuse was "powerful." Id. at 537, 123 S. Ct. at 2543.

Here, in stark contrast to Wiggins, Wood's counsel had investigated and knew about his borderline intellectual functioning before deciding not to present mental health evidence to the jury. Moreover, the post-conviction evidence was consistent with Dr. Kirkland's report and the other evidence already in counsel's possession, and there was certainly no new post-conviction evidence of prolonged and serious sexual or physical abuse. And Wood's counsel actually pursued a mitigation strategy—focusing on Wood's difficult upbringing and childhood, his role as a family leader, and his sadness over Ruby—instead of simply re-trying the guilt issue. This case is nothing like Wiggins.

investigation was reasonable. In other words, Wood has not even shown that there was more Dozier needed to know from a further mental evaluation.[29]

Simply put, the Alabama courts' decision—that Wood failed to establish his counsel's investigation was unreasonable—is amply supported by federal law. See Williams, 185 F.3d at 1242 (stating generally that counsel's decisions not to request additional mental evaluations are "virtually unassailable, especially when they are made by experienced criminal defense attorneys"); Mills v. Singletary, 161 F.3d 1273, 1286 (11th Cir. 1998) (concluding counsel did not provide ineffective assistance by not obtaining any mental health evaluation and by failing to "pursue mental health issues as mitigating evidence"); Bush v. Singletary, 988 F.2d 1082, 1089-92 (11th Cir. 1993) (determining counsel who made strategic decision not to undertake a formal investigation of psychological and mental health information did not provide ineffective assistance); see also Holladay v. Haley, 209 F.3d 1243, 1250 (11th Cir. 2000) (observing that counsel are "not necessarily required to seek independent mental evaluations in order to render effective assistance"); Mills v. Singletary, 63 F.3d 999, 1024 (11th Cir. 1995) ("The

---

[29]Further, Wood interacted and communicated well with his attorneys. Evidence of a defendant's interactions with counsel and his appreciation of the criminality of his conduct are highly relevant to claims that counsel was ineffective in failing to investigate further or obtain an additional mental health report. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); Callahan, 427 F.3d at 933 (same); Chandler, 218 F.3d at 1318-19 (same); Francis v. Dugger, 908 F.2d 696, 703 (11th Cir. 1990).

question is whether . . . ending an investigation short of exhaustion[] was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (quotation marks and citation omitted).[30]

In Williams, this Court stressed that "[t]he Supreme Court has told us that 'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments'"; that "the 'correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources'"; and that "to be effective a lawyer is not required to 'pursue every path until it bears fruit or until all hope withers.'" Williams, 185 F.3d at 1236-37

---

[30]Wood relies on Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988), and Brownlee v. Haley, 306 F.3d 1043 (11th Cir. 2002), but neither case is on point. Stephens was a pre-AEDPA decision, and in 1988 we were not restricted by AEDPA's requirement of deference to state court judgments. Additionally, Stephens's trial counsel knew he was in a mental hospital for two weeks, but failed to investigate why. 846 F.2d at 653. Here, Wood has never been in a mental hospital, and counsel investigated and knew from Dr. Kirkland's report that Wood had borderline intellectual functioning, a low IQ, and a third-grade reading level. Further, there was no harmful information about Stephens lurking in the pre-trial report or that might have been revealed through further investigation, while Dr. Kirkland's report contained a great deal of harmful information.

In Brownlee, counsel conducted no investigation and presented no mitigating evidence at all, and the State did not even contest Brownlee's claim that his counsel's performance was deficient. 306 F.3d at 1068-69. Moreover, the post-conviction evidence in Brownlee revealed a wealth of evidence of which counsel was not aware, such as the defendant's schizotypal personality disorder, seizure disorder, prior visit to a psychiatric hospital, episode in which he jumped out of a second-story window, earlier head injury from being shot, history of drug abuse, and borderline mental retardation. Id. at 1053, 1055-56.

60

(citations omitted). As we said in Williams, "[o]ther attorneys might have done more or less . . . or they might have made the strategic calls differently, but we cannot say that no reasonable attorney would have done as [they] did." Id. at 1244. Here, Wood has not shown that the state court decisions on his failure-to-investigate claim are contrary to, or an unreasonable application of, clearly established federal law.

## K. Prejudice prong

The state courts concluded that even if evidence of Wood's mental deficiencies had been presented (through Dr. Kirkland or the Rule 32 witnesses), Wood failed to show a reasonable probability that the outcome would have changed. Under Strickland, it is not enough for Wood to show that any "errors had some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S. Ct. at 2067. Instead, Wood must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. To establish that, Wood must show that "absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2069. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. "A petitioner's burden

of establishing that his lawyer's deficient performance prejudiced his case is . . .

high." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1322 (11th Cir. 2002). A

petitioner must "affirmatively prove prejudice." Strickland, 466 U.S. at 693, 104

S. Ct. at 2067.

To evaluate prejudice, we must consider the total available mitigation

evidence as adduced pre-trial, at trial, and at the Rule 32 hearings. See Williams v.

Taylor, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515 (2000). Here, the Rule 32

witnesses essentially agreed with Dr. Kirkland's 1994 evaluation that Wood (1)

had a low IQ in the borderline range of intellectual functioning and read on a third-

grade level, but (2) had a normal thought process, engaged in goal directed and

logical thinking, evidenced no memory deficits, could appreciate the criminality of

his conduct, and evidenced concrete reasoning ability.

Specifically, Dr. McClaren described Dr. Ron Cavanaugh's 1995 evaluation

of Wood, which determined Wood's full-scale IQ to be 69. Dr. McClaren pointed

out that Dr. Cavanaugh had the impression that Wood functioned higher than mild

mental retardation and "probably in the borderline range." Dr. McClaren described

his own IQ test of Wood in 2003—which also showed that Wood's true IQ was

between 61 and 69—as "consistent" with Dr. Cavanaugh's. Dr. Prichard agreed

with Dr. McClaren's testimony about Wood's IQ scores and that the data showed

"consistently over time [Wood had] functioned right about the same intellectually."

Drs. McClaren and Prichard testified Wood "functions at a higher level than a . . .

mildly mentally retarded person," and Wood's "adaptive skills are not impaired in

the mentally retarded range."

The teachers' testimony about Wood's intellectual functioning was

consistent with the findings of Drs. Kirkland, McClaren, and Prichard. Penn

testified her special education students had IQs in the 60 to 80 range, and Wood

was a "pretty average" student. Maddox testified the range of IQs for her special

education students was from the low 50s to the upper 70s or even 80, and Wood

probably had an IQ in the low to mid 60s. Penn and Maddox indicated Wood was

neat, clean, attended school regularly, and did not fail his classes. The

psychologists, Siler, Wright, and the teachers all provided extensive testimony

about Wood's high level of adaptive functioning. Thus, the Rule 32 evidence was

essentially identical to the information in counsel's possession at the time of trial:[31]

Wood had a low IQ in the borderline range of intellectual functioning, but

relatively high adaptive functioning.[32]

---

[31]Dr. Kirkland reported Wood had "problems with anger and impulse control" and diagnosed Wood with "Antisocial Acts," just as Dr. McClaren diagnosed Wood with antisocial personality disorder.

[32]This is principally why Wood is not mentally retarded under Atkins. The Rule 32 witnesses were in agreement that Wood functions at a higher level than a mildly mentally retarded person. Our colleague's separate opinion repeatedly refers to Wood's "mental

63

Wood contends that his counsel should have introduced evidence of his limited intellectual functioning and special education classes to suggest to the jury that, though legally culpable, he was less morally culpable because of a diminished ability to understand and process information, engage in logical reasoning, and learn from experience. See Atkins, 536 U.S. at 319, 122 S. Ct. at 2251; see also Williams, 529 U.S. at 398, 120 S. Ct. at 1515.

However, if counsel had introduced evidence of Wood's limited intellectual functioning and special education classes and attempted to paint Wood as not having sufficient intelligence to be morally culpable, the State in rebuttal could have introduced a wealth of harmful evidence that would have tipped the scales even more toward a death sentence. Presenting the Rule 32 evidence from the psychologists and teachers and/or Dr. Kirkland's findings about Wood's limited intellectual functioning would have had four adverse consequences for Wood.

First, presenting mental health evidence would have allowed the State to introduce Dr. Kirkland's report about Wood's intellectual functioning, which contained harmful information, including: (1) Wood's statement to Dr. Kirkland denying that he drank alcohol on the day of Ruby's murder, which would have undercut Wood's defense that he was distraught and intoxicated at the time of the

retardation," but it is important to note that even the Rule 32 evidence supported the state courts' finding that Wood is not mentally retarded.

murder;[33] (2) Wood had problems with anger and impulse control and felt injurious

to others in the past; and (3) Wood had nineteen prior arrests between 1981 and

1984,[34] including three arrests for theft of property, one for harassment, one for

reckless endangerment, and one for criminal possession of a forged instrument.

See Gaskin v. Sec'y, Dep't of Corr., 494 F.3d 997, 1004 (11th Cir. 2007) (denying

ineffective assistance claim and stating "the fact remains that further investigation

and further evidence would have opened the door to damaging personal history

evidence"); Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 788 (11th Cir.

2003) (concluding counsel was not ineffective for failing to introduce evidence of

mental defects and personality disorder because, inter alia, "counsel feared that

evidence of mental defects and personality disorder would undermine [the

defendant's] credibility and be inconsistent with his alibi defense"); Robinson v.

Moore, 300 F.3d 1320, 1348 (11th Cir. 2002) (denying ineffective assistance claim

and noting "some potential mitigation witnesses might have harmed [the

---

[33]According to Dr. Kirkland's report, Wood was "quite willing to discuss the lack of drugs or alcohol on the day of the offense."

[34]In January 1985, Wood received a fifteen-year sentence for his shooting of Siler. Wood was paroled on the Siler sentence in February 1990 and reincarcerated at some point before he was paroled again on the Siler sentence in June 1993. Wood murdered Ruby in September 1993. The nineteen prior arrests would have shown that Wood was consistently in trouble with the law and only his Siler incarceration stopped his arrests.

defendant's] case").[35]

Second, any potential effectiveness of evidence of Wood's mental deficiencies from the psychologists or teachers would have been eradicated by the State's overwhelming evidence of Wood's high level of adaptive functioning (at work and personally); his ability to engage in logical thinking, goal directed and intentional conduct, and concrete reasoning; his complete memory of his behavior at the time of the murder; the fact that he had no mental problem that detracted from his ability to appreciate the criminality of his conduct; and the lack of any causal relationship between his mental condition and the murder. Wood has not explained how the overall Rule 32 evidence would have mitigated his criminal responsibility or moral culpability. If anything, the Rule 32 evidence, along with Dr. Kirkland's report, showed that Wood was highly functional, had full appreciation for the criminality of his conduct, and was indeed morally culpable.

Third, Dr. Kirkland's report contained important details about Wood's prior

---

[35]Our colleague's separate opinion in footnote 15 suggests these arrests may not have been admitted, but relies on decisions about prior arrests without convictions not being admitted to show a defendant's guilt of a separate crime. None of the cited cases involves a penalty phase trial after a defendant's guilt has been established. In any event, if counsel had tried to show Wood's mental status, the State clearly would have introduced Dr. Kirkland's report, which included these arrests, to paint a fuller picture of Wood's mental functioning. See Gaskin, 494 F.3d at 1004 (noting that "further investigation and further evidence would have opened the door to damaging personal history evidence"); Chandler v. Moore, 240 F.3d 907, 918 (11th Cir. 2001) (stating that "hearsay evidence is admissible at a capital sentencing"); Ex Parte McGahee, 632 So. 2d 981, 982-83 (Ala. 1993) ("The trial court may properly consider hearsay at the penalty phase of the trial if the defendant has an opportunity to rebut the evidence.").

shooting of Siler and how Wood shot her through the window of her own residence after seeing her with another man, which Trotter had kept from the jury by successfully objecting to Siler's testimony in the penalty phase. The jury would have learned that Wood had previously committed a crime frighteningly similar to his murder of Ruby, which would have demonstrated Wood calculated his killing of Ruby and had a pattern of attempting to kill his ex-girlfriends at their own homes. See Clisby v. State, 26 F.3d 1054, 1057 (11th Cir. 1994) (finding no prejudice where Clisby committed brutal murder and had killed before). Indeed, the jury might well have concluded that Wood, after shooting Siler, "learned his lesson" and realized that in order to be sure he killed an ex-girlfriend who had the audacity to date another man, he needed to do more than merely shoot through a window—he had to sneak into the house and shoot her from point-blank range in her bed. The Siler evidence in Dr. Kirkland's report would have completely undermined counsel's efforts to paint Wood as heartbroken and someone who killed in the heat of passion, and it also would have been contrary to the defense's successful effort to keep Siler from testifying.

Fourth, presenting evidence of Wood's borderline intellectual functioning and need for special education classes might have suggested that Wood was not in regular school classes but was a special education student with a low IQ reading at

67

a third-grade level who left school for that reason.  Such evidence might have weakened trial counsel's mitigation picture of Wood leaving high school only to help feed and support his five sisters.

Even if Wood's counsel could have somehow presented the potentially favorable evidence from Dr. Kirkland's report and the Rule 32 hearings without presenting its unfavorable aspects, Wood has still failed to show that the potentially favorable evidence would have outweighed the aggravating factors here and thus changed the outcome of his sentence.  In this case, after trying to kill Ruby—the mother of his child—two weeks earlier and being told to stay away, Wood snuck into Ruby's home at night, entered her bedroom, and brutally murdered her by shooting her in the face with a shotgun at point-blank range. Wood then bragged to his cousin, "I shot that bitch in the head, and [blew] her brains out and all she did was wiggle."  Given the brutal, calculated nature of the murder, it is not reasonably probable that evidence of Wood's borderline intellectual functioning and special education classes would have swayed the jury, especially given Wood's high level of adaptive functioning.  See Clisby, 26 F.3d at 1057.

Here, there were not one or two, but three statutory aggravating circumstances—(1) Wood murdered Ruby during a burglary; (2) Wood had a prior

violent felony conviction; and (3) Wood murdered Ruby while on parole. The sentencing judge, who did have Dr. Kirkland's and another psychological report, even observed that Wood's aggravating circumstances "far outweigh[ed] the mitigating circumstances . . . in all regards." Thus, even when evidence of Wood's mental deficiencies was introduced, it was significantly undercut by Wood's high level of adaptive functioning, and the three aggravating factors still far outweighed such mitigation evidence.

In prior cases with three aggravating factors or a brutal murder, this Court concluded the defendant failed to show a reasonable probability that additional mitigation evidence would have changed the death sentence. See Callahan, 427 F.3d at 938; Clisby, 26 F.3d at 1057. Moreover, we have rejected prejudice arguments where mitigation evidence was a "two-edged sword" or would have opened the door to damaging evidence. Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir. 2001); see Gaskin, 494 F.3d at 1004 (affirming death sentence where jury recommended death by a vote of eight to four, and noting further mitigation evidence "would have opened the door to damaging personal history evidence").

The prejudice outcome in Callahan is instructive here. In Callahan, the district court granted the writ and found prejudice where counsel failed to present

69

(1) evidence of Callahan's dysfunctional upbringing and (2) psychological evidence, such as Dr. Goff's evaluation that Callahan had a "mild cognitive deficit, which caused poor memory skills, and a paranoid personality disorder." Callahan, 427 F.3d at 922, 926.[36] Reversing and reinstating the death sentence, this Court noted that the state court found three aggravating factors, and that particularly planned or brutal murders make it difficult for even the best lawyers to convince a sentencer to forgo a death sentence. Id. at 938. In Callahan, the three aggravating factors similarly were: (1) the crime was committed while the defendant was on probation; (2) the defendant was convicted previously of a crime of violence; and (3) the murder was committed during a felony (kidnapping). Id.; see also Hubbard, 317 F.3d at 1260-61 (in light of three aggravating factors found by sentencing court, defendant failed to establish prejudice from counsel's failure to introduce hospital records indicating "mental retardation, and deprived upbringing").

Likewise, in Clisby, this Court concluded the defendant had not shown prejudice where counsel failed to introduce evidence of "borderline intellectual functioning" and "chronic drug and alcohol abuse." Clisby, 26 F.3d at 1055, 1057

---

[36]"[O]f all the psychiatrists and psychologists to examine Callahan, only one came close to diagnosing Callahan in the same way [Dr. Goff] did." Callahan, 427 F.3d at 922. As discussed, in Wood's case, there was no material difference of opinion between the Rule 32 mental health experts and the pre-trial mental health expert (Dr. Kirkland), which is another reason why Wood failed to show that the Rule 32 evidence would have changed the outcome here.

70

(quotation marks omitted).[37]  We concluded Clisby did not suffer prejudice, in light of the brutal nature of the murder—Clisby broke into the victim's house and killed him with an axe—and the fact that Clisby had killed before.  Id.  We concluded, "[g]iven the aggravating and mitigating factors, nothing Clisby has put forth undermines our confidence in the outcome of his sentencing proceeding."  Clisby, 26 F.3d at 1057.

Given Wood's high level of adaptive functioning, nothing in Wood's Rule 32 evidence establishes a reasonable probability that evidence of his intellectual functioning and special education classes would have outweighed the strong aggravating factors here.  At a minimum, Wood has not carried his burden of showing that the state courts' prejudice determination was objectively unreasonable.

In summary, our AEDPA role is not to determine de novo whether Wood's counsel were ineffective or whether Wood was prejudiced.  We are concerned only with whether the state courts' findings and conclusions—that Wood did not carry his burden to show deficient performance or prejudice—were contrary to, or an

---

[37]Clisby's trial counsel presented an expert who told the sentencer that he was unable to locate any disorder beyond "possibly anti-social personality disorder."  Clisby, 26 F.3d at 1055 (quotation marks omitted).  The post-conviction mental health expert testified Clisby suffered from three problems: (1) antisocial personality disorder; (2) borderline intellectual functioning; and (3) chronic drug and alcohol abuse.  Id.

71

unreasonable application of, clearly established federal law, or were based on an unreasonable determination of the facts. Again, AEDPA "limits our review of the decisions of the state courts and establishes a 'general framework of substantial deference' for reviewing 'every issue that the state courts have decided.'" Crowe v. Hall, 490 F.3d 840, 844 (11th Cir. 2007) (citation omitted), cert. denied, __ U.S. __, 128 S. Ct. 2053 (2008). Based on the record before us, Wood has not satisfied AEDPA's requirements as to his ineffective assistance claim.

## VI. Conclusion

We affirm the district court's November 20, 2006 order denying Wood's Atkins and Batson claims but reverse the order's grant of the writ based on ineffective assistance of counsel and remand with instructions to deny Wood's § 2254 petition.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

72

BARKETT, Circuit Judge, concurring in part, dissenting in part:

I concur with the majority opinion's disposition of Wood's claims based on Atkins v. Virginia, 536 U.S. 304 (2002), and Batson v. Kentucky, 476 U.S. 79 (1986). I must respectfully dissent, however, from the majority's holding that Wood is not entitled to habeas relief on his claim of ineffective assistance during the penalty phase of his trial, because I believe that conclusion ignores specific and direct evidence of ineffectiveness of counsel in favor of nothing but pure speculation that the failure to investigate and present mitigating evidence was a "strategic decision."

No evidence of Wood's mental retardation was ever presented to the jury. In considering the death penalty, the jury never had the opportunity to weigh his actions in light of his undisputed diminished mental capacity. The majority claims that the record supports the state court's finding that Wood's counsel decided against pursuing or presenting evidence of Wood's mental impairments. The record "evidence" upon which the majority relies, however, consists of the vague and speculative references of one attorney, Dozier, that he was "sure" the trial team "would have" adequately prepared for the penalty phase, despite his own testimony that he could not recall doing anything specific given the passage of

73

time.[1]  On the other hand, the majority altogether disregards direct and specific evidence to the contrary.

A fair reading of the entire record compels the conclusion that Wood's lawyers, in fact, did not adequately prepare for the penalty phase and their direct testimony concedes as much.  Wood's counsel were aware that Wood suffered from mental impairments from the very beginning of their trial preparation.  Despite their knowledge, counsel did not look into, follow up on, or further pursue this critical source of potentially mitigating evidence.  The egregious failures of Wood's defense counsel to investigate and develop available mitigating evidence for the penalty phase of Wood's capital case, as delineated below, epitomizes the sort of deficient performance that an ineffective assistance claim exists to guard against.  Thus, I must dissent.

## I. Counsel must make an informed decision regarding the investigation and presentation of mitigating evidence

To succeed on a claim of ineffective assistance of counsel, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and must demonstrate that "any deficiencies in counsel's

---

[1] (See Maj. Op. at 16.) (discussing Dozier's testimony that he was "sure" that the "trial team" interviewed potential witnesses); (Id. at 19, 41.) (reprinting Dozier's testimony that "we [the trial team] would have" presented useful information from Dr. Kirkland's report and that though he could not recall if he personally read it, he was "sure we [the trial team] did"); (Id. at 49.) (paraphrasing Dozier's testimony that if the trial team had identified helpful information in Dr. Kirkland's report, he was "sure" they "would have" used it) (emphasis added throughout).

74

performance [were] prejudicial . . . ." Strickland, 466 U.S. 668, 688, 692 (1984).

That is, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

With reference specifically to a lawyer's duty to investigate, the Supreme Court held in Strickland that:

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 691. The Supreme Court has made clear that the obligation to present specific mitigating evidence is separate and distinct from a lawyer's obligation to adequately investigate the background of the defendant in order to make an informed judgment about whether certain evidence should be presented. See Wiggins v. Smith, 539 U.S. 510, 522–23 (2003) ("[O]ur principal concern in deciding whether [Wiggins' lawyers] exercised 'reasonable professional judgmen[t]' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable." (emphasis in original) (citation omitted)).

75

This circuit has repeatedly held that "in preparing for a death penalty case, 'a[n] attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence,'" Dobbs v. Turpin, 142 F.3d 1383, 1387 (11th Cir. 1998) (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir. 1994)) (brackets in original), and that "[t]he failure to do so may render counsel's assistance ineffective." Id. (quoting Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir. 1995)). We have also "reject[ed] the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and [to] make a reasonable choice between them." Dobbs, 142 F.3d at 1388 (quoting Baxter, 45 F.3d at 1514; citing Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991)). Simply put, "strategic decisions . . . 'must flow from an informed decision.'" Dobbs, 142 F.3d at 1388 (quoting Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989)). No such strategic decisions could possibly have been made in this case because counsel had failed to adequately investigate the available mitigating evidence.

## II. **The record reflects totally inadequate penalty phase preparation**

A careful review of the record clearly demonstrates the appalling lack of preparation that went into the penalty phase of Wood's trial. Cary Dozier, Frank Ralph and Ken Trotter were court-appointed attorneys representing Wood. At the

76

time, Trotter had been practicing law for only about five months.[2] Ralph testified that Trotter "was very inexperienced. He was very nervous about this whole case. And it was quite evident just talking with him how troubled he was by it."

Despite Trotter's lack of experience, it is undisputed by the direct evidence in the record that he was given primary responsibility for the penalty phase of Wood's trial by the two more experienced attorneys.[3] Ralph testified that though it was "not entirely correct" that he and Dozier had "no involvement in the preparation for or investigation of the penalty phase," he added simply, "I remember that we met and talked about it." Other than this vague reference to having "talked about" the penalty phase, Ralph's overwhelming testimony is that Trotter alone handled the penalty phase of Wood's trial, and that Ralph had

_____

[2] Although Alabama law required attorneys appointed in capital cases to have at least five years of experience in criminal law, only Ralph and Dozier had the requisite experience. See Ala. Code § 13A-5-54 (1994) ("Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law."). While I do not address—as the issue was not raised—whether designating an entire portion of the trial to an attorney who lacks the requisite five years of experience comports with the requirements of Alabama Code § 13A-5-54, the statute highlights the legitimate concerns that accompany the appointment of an inexperienced attorney as counsel in a capital case.

[3] In footnote 11 of its opinion, the majority claims that Dozier and Ralph were both present and active in the penalty phase. But merely being present and active—by raising an occasional objection during the proceedings—is insufficient to demonstrate that Dozier and Ralph adequately supervised or assisted Trotter. Moreover, the assertion does not address counsel's collective failure to adequately investigate Wood's mental health status and background or to otherwise prepare for the penalty phase.

nothing to do with it. Ralph was clear that counsel "decided Ken Trotter would handle [the penalty phase] . . . that that was going to be his responsibility." According to Ralph, "Ken Trotter . . . handl[ed] the entire matter."

Similarly, although Dozier claimed that all three lawyers "participated" in the various aspects of Wood's case, he could not specify any particular matter that he handled with respect to the penalty phase. Moreover, Dozier's statements pertaining to any "participation" by all three lawyers appear to be primarily directed to the guilt phase, and not the penalty phase. Dozier testified that "[Trotter] did basically most of the motions . . . [Dozier] and Frank [Ralph] and Trotter put them all together, and we basically let Trotter handle the sentencing part of it." The record reflects, however, that there were no written motions filed during the penalty phase of the trial.[4] Dozier did not recall whether he handled any of the witnesses for the penalty phase or whether he read Dr. Kirkland's report before trial or met with Dr. Kirkland, but he was "sure Frank [Ralph] or Trotter or some of us did." Dozier could not remember counsel's penalty phase strategy, noting that the "[o]nly thing [he] remember[ed] was something about [Wood's] childhood, and [he did not] recall what it was all about." Moreover, Dozier did not

---

[4] Trotter prepared written motions only for the guilt/innocence phase of trial. Indeed, according to Ralph: "It seems like prior to the actual trial preparation we had a series of motions that I think Mr. Trotter prepared. We had a hearing on that. We all participated in that."

78

recall even having considered introducing evidence at the penalty phase based on Dr. Kirkland's findings. Dozier reiterated that it was "Trotter [who] handled the aggravating circumstances as far as the sentencing process went [and that] [b]asically [he (Dozier)] and Mr. Ralph were basically the trial lawyers." Dozier again stated that he and Ralph "basically designated Trotter to do the sentencing aspect of it."

Trotter likewise specifically verified that he had been in charge of the penalty phase.[5] According to Trotter's testimony at the Rule 32 hearing, originally Dozier was supposed to be the principal attorney who was to "oversee all phases of the trial, including both the penalty . . . and the guilt or innocence adjudication," but Dozier ultimately focused on the guilt/innocence phase, and, at the last minute, turned over to Trotter all of the responsibility for preparing and presenting the penalty phase. It was Trotter's understanding "that Mr. Ralph was going to conduct the penalty phase," however, "shortly before the trial . . . a decision was made . . . that [Trotter] would represent Mr. Wood during the penalty phase in the courtroom" instead. Trotter also testified that as the penalty phase approached, he "felt like [he] was working a lot of it independently and trying to call as much as

---

[5] In footnote 11 of its opinion, the majority mistakenly suggests that Trotter's testimony conclusively demonstrates that he was given sufficient assistance or supervision; however, excerpts from the record—which follow the accompanying text above—show otherwise.

[he] could to Mr. Ralph and Mr. Dozier to get their feedback on stuff.  But to a certain extent, [he] was having to do a lot of work independently, more so than [he] thought when [he] initially accepted the appointment . . . ."  A couple of months before trial, Trotter expressed his frustration at the lack of supervision and guidance he was receiving in a letter to Kevin Doyle, a capital defense attorney from the Southern Poverty Law Center, stating, "I have been stressed out over this case and don't have anyone with whom to discuss the case, including the two other attorneys." (emphasis added).  Thus, there is little indication in the record that either Ralph or Dozier offered any guidance to Trotter—a lawyer with only a few months of legal experience—on how to proceed in the penalty phase of a capital case.

Although the majority attempts to portray Dozier as "lead counsel" throughout both the guilt and penalty phase, this is merely the majority's characterization of his role.  (Maj. Op. at 15, 18, 20, 26.)  None of Wood's counsel specifically testified that Dozier was "lead counsel," and in fact testified directly to the contrary as to the penalty phase.  Trotter specifically testified that Dozier decided that Trotter was to "assist primarily with the penalty phase—preparation of the penalty phase" but that ultimately Trotter was to replace Ralph as the person "primarily responsible for the penalty phase."

80

As soon as the guilt/innocence phase ended and Wood was convicted, the trial judge announced that the penalty phase would begin the following day. Trotter later testified that, at the time, he "didn't think [they] were actually prepared to move forward with the penalty phase of the trial when [they did]."[6] Nonetheless, neither Trotter nor the other two attorneys moved for a continuance in order to afford them time to prepare adequately for the penalty phase. The next day, when the penalty phase before the jury was about to begin, Trotter, for the first time, asked the trial court for a psychological evaluation of Wood.

Although Dr. Kirkland had prepared a psychological report four months earlier, primarily to assess Wood's competency for trial, Trotter explained to the court that there had been no follow-up.[7] Dr. Kirkland had found that Wood was competent to stand trial and was able to appreciate the criminality of his acts at the time of the offense. However, his report also noted that Wood was "reading on

---

[6] The majority argues that while Trotter did not initially think that they were prepared to proceed with the penalty phase, he consulted with Ralph and Dozier, and their concerns were alleviated. (Maj. Op. at 22.) While Ralph and Dozier's concerns may have been alleviated, Trotter never testified that he was comfortable proceeding. Further, the majority's contention that Dozier made the decision that no further evaluation was needed based on Dr. Kirkland's report is directly undercut by Trotter's request for additional psychological evaluation prior to sentencing. If Dozier did make such a decision, it then only follows that Trotter must have been extremely uncomfortable with the decision, in order to disregard it in making the request.

[7] The majority claims that this psychological evaluation was sufficient to investigate any mitigating evidence based on Wood's mental health. However, "[o]btaining competency evaluations from mental health experts for guilt phase purposes does not discharge counsel's duty to consult such experts for the penalty phase because the considerations involved are very different in the two phases." Belmontes v. Ayers, 529 F.3d 834, 859 (9th Cir. 2008).

81

less than a 3rd grade level," "could not use abstraction skills much beyond the low average range of intellect," and was "functioning, at most, in the borderline range of intellectual functioning."  Despite this information, counsel conducted no further investigation regarding Wood's mental impairments with Dr. Kirkland or anyone else.[8]

In requesting further psychological testing of Wood immediately before sentencing, Trotter told the court what should have been obvious to any reasonable lawyer upon initially reading the report: that Dr. Kirkland "indicates that the defendant may have psychological problems that need further assessment." Indeed, Trotter conceded that even though the report had been completed months earlier, "[n]o further investigation ha[d] been done, psychologically, of those points."  Knowing that there had been a failure to pursue available mitigating evidence, and that it was too late to present it to the jury,  Trotter had to ask, at that late date, that "prior to any final sentencing by the Court . . . there be further psychological evaluation done of the defendant, although that won't be admissible

---

[8]  Contrary to the majority's characterization in footnote 9, my position does not rely on a belief that Wood's counsel were completely ignorant of his mental status.  Instead, it focuses on the failure of Wood's counsel to further investigate and develop mitigating evidence having seen Dr. Kirkland's report that made reference to Wood's "borderline range of intellectual functioning."

82

to this jury, prior to the judge rendering his final verdict."[9]  The judge indicated

that he would "consider that [request] after we finish today."  Remarkably,

however, neither Trotter nor Ralph nor Dozier followed up with the request.  The

record reflects that the jury returned the verdict recommending the death penalty

that same day, and that neither the judge nor defense counsel raised the issue of the

psychological evaluation again.

Moreover, despite counsel's knowledge that Wood was mentally impaired,

Trotter never asked any of the family witnesses questions regarding Wood's

mental impairments when he called them to testify, nor did Trotter ever try to

directly contact Wood's former teachers.  In addition, though Trotter had issued a

subpoena for Wood's school records, no records were ever produced, and,

amazingly again, counsel never followed up or sought legal action to enforce the

subpoena.  Discovering at the last minute that no records had ever been produced,

Trotter once again had to make an untimely request to the judge.  Just before the

jury was seated for the penalty phase, Trotter, for the first time, brought to the

judge's attention that he had not received the records to which he was entitled from

---

[9] Even had Trotter acquired and presented this evidence to the judge, his failure to investigate and present this evidence to the jury would have still rendered him ineffective for the penalty phase. We have held that the "jury is too important, and the right to introduce all mitigating evidence is too essential, to permit a judge to correct so egregious a failure by counsel to investigate, obtain, or present powerful mitigating evidence to the sentencing jury." Brownlee v. Haley, 306 F.3d 1043, 1079 (11th Cir. 2002).

83

the "Board of Pardons and Paroles and the various state prisons in which Mr. Wood may have been incarcerated," as well as records from the "Department of Human Resources." Though the request for these documents had been granted some two months earlier, it was not until the morning the penalty phase was to begin that Trotter finally brought this to the court's attention. None of Wood's lawyers ever saw these documents or ever considered the mitigating evidence they contained.

Had Trotter adequately investigated the references in Dr. Kirkland's report, or followed up on the school records, or even talked to Wood's family and teachers about his mental retardation, this important aspect of Wood's life could have been presented to the jury. None of this, or any other, evidence of Wood's mental impairments was ever presented to the jury. Moreover, none of this evidence could possibly have had any adverse effect on the jury's consideration of Wood's appropriate penalty.

Shortly before the sentencing hearing in front of the judge was to begin, Trotter wrote to his co-counsel reiterating that an independent psychological evaluation should be conducted, "even if that means asking for a postponement of the sentencing hearing [before the judge]." Notwithstanding his last-minute concerns, however, Trotter did not seek a continuance after his co-counsel

expressed a belief that the judge would not likely grant one. Moreover, Trotter again failed to follow up on his request for a psychological evaluation to be, at least, presented to the judge.

In a last-ditch attempt, and having not pursued the psychological evaluation he believed to be necessary, Trotter argued to the judge at the sentencing hearing that the court should consider Dr. Kirkland's report as evidence of Wood's mental impairments for mitigation purposes—even though the report had been prepared primarily to evaluate Wood's mental state at the time of the crime and his competency to stand trial. He stated: "[A]s reported in the psychological report by Dr. Kirkland, [Wood] cannot use abstraction skills much beyond the low average range of intellect, and that he is at most functioning in the borderline range of intellectual functioning . . . would mitigate any aggravating circumstances in this case . . . ." He presented no other evidence to support Dr. Kirkland's statements.

Simply put, the weight of the evidence in the record demonstrates that Trotter, an inexperienced and overwhelmed attorney, was given primary responsibility for investigating and preparing for the penalty phase of Wood's trial, and he was not given any significant assistance from the rest of the trial team. He realized too late what any reasonably prepared attorney would have known: that evidence of Wood's mental impairments could have served as mitigating evidence

85

and deserved investigation so that it could properly be presented before sentencing. Due to Trotter's inexperience, and to Ralph and Dozier's lack of participation in preparation for the penalty phase, no investigation of Wood's mental retardation was conducted at all, and that alone is the reason it was never presented to the jury in mitigation. There can be no other reasonable reading of this record.

Counsel's failure to investigate and present the critical evidence of Wood's mental impairments to the jury certainly "fell short of the standards for capital defense work articulated by the American Bar Association," Wiggins, 539 U.S. at 524, that prevailed at the time of Wood's trial. See generally ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases at 11.4.1(C), 8.1 (commentary) (1989) (requiring counsel to engage in sufficient "efforts to discover all reasonably available mitigating evidence," and to "conduct a thorough investigation of the defendant's life history and background." (emphasis added)). Their deficient representation violated Wood's Sixth Amendment right to counsel.[10] See Stephens v. Kemp, 846 F.2d 642, 653 (11th Cir. 1988) (finding

_____

[10] The majority opinion finds our decision in Hubbard v. Haley, 317 F.3d 1245 (11th Cir. 2003), to be particularly instructive as to "why it was not deficient performance for counsel not to present evidence of Wood's low IQ." (Maj. Op. at 54–55.) That case is completely inapplicable. The performance of Hubbard's counsel is distinguishable from the performance of counsel here because Hubbard's defense strategy, even at sentencing, was to maintain that he was actually innocent of the crime. Hubbard, 317 F.3d at 1260. Here, defense counsel's strategy during sentencing was to put on some evidence of mitigation; counsel simply failed to sufficiently investigate the sources that may have provided them with evidence of Wood's mental impairments. Moreover, Hubbard was unable to identify any witnesses who may have

86

ineffective assistance where, despite being put on notice of a possible mental illness, counsel "elected to pursue his investigation into [the defendant's] mental condition no further" and "conducted no inquiry whatsoever into the possibility of presenting evidence of [the defendant's] mental history and condition in mitigation of punishment"). Given this record, I agree with the district court's finding that the state court's denial of Wood's claim of ineffective assistance of counsel involved an unreasonable application of Strickland.

### III. No informed strategic decision was ever made to exclude evidence of mental retardation

Given the totally inadequate penalty phase preparation that the record reveals, as delineated above, it is clear that Wood's counsel's failure to investigate or present mitigating evidence of Wood's mental impairments resulted from their sheer neglect. The majority's attempt to characterize their failure as a strategic decision "resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." Wiggins, 539 U.S. at 526-27. There is no basis in this record to conclude that the failure to investigate was, or could have been, a reasonable strategic decision made by Wood's

---

been able to testify on his behalf at sentencing. Id. Wood, on the other hand, was able to identify both teachers and family members who would have been able to testify as to his mental impairments. Finally, Hubbard's attorneys still managed to argue mitigation evidence to the jury based on what was in the Bryce Hospital records. Id. at 1260 n.25. Wood's jury never even knew a psychological evaluation existed.

87

counsel.[11]

First, the majority portrays Dozier as the primary decision-maker throughout trial, including during the penalty phase preparations. The majority claims that as "lead counsel," Dozier was responsible for deciding against presenting any mitigating evidence of Wood's mental impairments. However, as more fully explained above, Dozier confirmed that he and Ralph "basically designated Trotter to do the sentencing aspect of [the trial]." The record is clear that Dozier was not the "lead counsel" in charge of penalty phase preparations.

Second, the record demonstrates that none of Wood's counsel, including Dozier, made a reasonable strategic decision not to investigate or present evidence of his mental impairments. To the contrary, as also explained above, Trotter tried to obtain and present such testimony but could not because he tried too late. Trotter entreated the trial judge to, "prior to any final sentencing by the Court[,] . . . [allow] further psychological evaluation of the defendant, although that won't be admissible to this jury, prior to the judge rendering his final verdict." Further,

---

[11] The majority cites to Trotter's testimony that Dozier reviewed Dr. Kirkland's report and that Dozier determined that no further evaluators were necessary. (Maj. Op. at 18-19, 26, 58.) Even if it were true that Dozier decided that it was unnecessary to further investigate Wood's mental health, such a decision would have been inherently unreasonable because Dozier failed to adequately investigate Wood's mental retardation before making that determination, especially in light of Trotter's repeated concerns regarding his readings that psychological evaluations were a source of mitigating evidence in death penalty cases. See Dobbs, 142 F.3d at 1388.

88

Trotter specifically stressed to the judge, as mitigating evidence, Dr. Kirkland's conclusion that Wood could not "use abstraction skills much beyond the low average range of intellect, and that he [was] at most functioning in the borderline range of intellectual functioning." Trotter's belated attempts to argue that Wood's mental impairments should be considered as mitigating evidence directly contradict the finding that Wood's counsel made a decision not to present mental impairment evidence during the penalty phase. Rather, Trotter's efforts prove that counsel hoped to do just that.[12]

Finally, even if Wood's counsel had decided not to pursue evidence of his mental impairments, such a decision would have been unreasonable given their absolute lack of investigation. See Dobbs, 142 F.3d at 1388 ("[We] reject[] the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and [to] make a reasonable choice between them."); Belmontes, 529 F.3d at 857 ("[A] decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to his making an

---

[12] While state court findings that are supported by the record are due deference under AEDPA, we may not defer to them where there is clear and convincing evidence which indicates that the state court's findings amount to "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). An unwillingness to turn a blind eye to evidence in this case that demonstrates the state court's findings were unreasonable is not the same as conducting a de novo review.

89

informed decision."). Defense counsel's failure to investigate and/or introduce mitigating evidence of Wood's mental impairments "resulted from inattention, not reasoned strategic judgment." Wiggins, 539 U.S. at 526.

## IV. The failure to investigate and present mental mitigating evidence was prejudicial

I agree with the district court that Wood was prejudiced by counsel's ineffectiveness. In assessing the prejudice caused by counsel's ineffective assistance at the penalty phase of a capital trial, we reweigh the evidence in aggravation against the totality of available mitigating evidence, which includes both the evidence introduced at trial and the evidence introduced in the habeas proceedings. Williams v. Taylor, 529 U.S. 362, 397–98 (2000); Wiggins, 539 U.S. at 534.

Given the nature of the State's evidence in aggravation of Wood's offense, as described in the majority opinion, evidence of Wood's mental deficiencies was essential to mitigation because it would have offered the necessary context for the jury to have properly evaluated Wood's aberrant behavior before recommending a sentence. Indeed, Wood's "cognitive and behavioral impairments" could have suggested to the jury that, though legally culpable, he was "less morally culpable" in terms of the death penalty, because of his "diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to

90

control impulses." Atkins, 536 U.S. at 320. As in Williams, "the reality that [Wood] was borderline mentally retarded, might well have influenced the jury's appraisal of his moral culpability." 529 U.S. at 398 (citations and internal quotations omitted). Indeed, evidence of mental impairments "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). We have also recognized that "[o]ne can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider." Blanco v. Singletary, 943 F.2d 1477, 1503 (11th Cir. 1991).[13]

However, instead of presenting such evidence, Trotter's penalty phase case consisted of testimony from three of Wood's family members—Wood's father and two of his sisters—whose testimony made no mention of Wood's mental impairments and amounted to little more than a plea for juror sympathy. At the

---

[13] In footnote 32, the majority suggests that I fail to recognize that the state court found that Wood is not mentally retarded. This is incorrect. Rather, I recognize that Wood was found to not be mentally retarded *for the purposes of Atkins*. The majority apparently labors under the misapprehension that the state court's finding that Wood is not mentally retarded for the purposes of Atkins means that evidence of Wood's mental impairments, which were not disputed by anyone, could not have served as mitigating evidence.

91

end of the one-day penalty phase, the jury recommended the death penalty by a vote of ten to two. In the subsequent sentencing hearing, the judge found that the State had proven three aggravating circumstances and that there were no mitigating circumstances, and sentenced Wood to death by electrocution.

At the Rule 32 hearing, Trotter admitted candidly, "I would like to have done more. I wished I could have done more. And I recall that at the penalty phase the verdict was ten to two. And I felt like if I could have just done a little more that maybe it could have been nine to three and that that would have been enough. And I regret that whatever it was to require that little more wasn't there." Moreover, Ralph testified, "I don't think that Trotter . . . brought out enough of Wood's background through enough witnesses of the type of upbringing that he had had . . . . I felt like there were more circumstances in his background that were potentially mitigating that were not explored . . . ." Ralph further testified that the evidence presented at the penalty phase "seemed inadequate given the circumstances." Despite these observations, neither Ralph nor Dozier sought to introduce any evidence in addition to what Trotter presented.

On this record, I agree with the district court that there is a reasonable probability that the outcome of Wood's penalty phase would have been different had Wood's lawyers rendered effective assistance of counsel. In addition to any

92

mental health experts that Wood's counsel might have presented, counsel could have called Wood's teachers, who testified at the Rule 32 hearing freely and without subpoena.[14] Janet Penn would have testified, as she did at the Rule 32 hearing, that Wood was a student in her special education class for two years, that all of her students had low IQ scores, and that Wood's IQ was in the "middle to low" range in comparison to the other students in her class. Penn would have testified also that all of the special education students, regardless of age or grade level, were placed in one room in a basement; the lighting was barely adequate; the room would flood when it rained a lot; and the students were known around school as the "moles" that "lived in a mole hole." Hilda Maddox, another of Wood's teachers who testified at the Rule 32 hearing, would have explained that Wood's IQ was probably "low to mid 60s," that Wood was "educable mentally retarded or trainable mentally retarded," and that among the students so classified, Wood ranked in the "middle range." The jury would have been presented with testimony that Wood—even today—can read only at the third grade level and can "not use abstraction skills much beyond the low average range of intellect." Though this information was all readily available, Trotter failed to investigate any of it in

---

[14] Wood's teachers confirmed at the Rule 32 hearing that had they been contacted, they would have agreed to speak with Wood's counsel and to testify regarding Wood's mental retardation and the conditions at Wood's school.

93

preparation for the penalty phase or to present it to the jury.

The majority claims that Wood was not prejudiced by his counsel's failure to call Dr. Kirkland as a witness or introduce Dr. Kirkland's report because doing so would have opened the door to the admission of potentially damaging content in the report, namely Wood's denial that he had been drinking on the day of the offense, a list of Wood's prior arrests, and the details of Wood's prior violent felony conviction. (Maj. Op. at 52–53, 64–68.) This argument is purely speculative, and it is inapposite because it does not address Wood's claim that his counsel failed to even <u>investigate</u> his mental deficiencies once those deficiencies had been discovered. The discharge of that duty could have led counsel to evidence which would not have had any detrimental effect, such as the testimony of his teachers. Moreover, had counsel properly investigated, they would have been able to assess the admissibility of Dr. Kirkland's testimony in light of the testimony of other witnesses or existing law pertaining to the admission of evidence at that time.[15] The likelihood that counsel could have put on the

---

[15] Specifically, evidence of Wood's past felony may have been viewed as cumulative evidence since the State introduced a certified copy of Wood's prior conviction for first-degree assault and the Pardons and Parole clerk testified that Wood was on parole when he committed the murder. Alternatively, the trial court may have ruled to exclude Dr. Kirkland's testimony about Wood's past offenses on the basis that it would be unduly prejudicial, just as it did when the State attempted to call Barbara Siler, the victim in Wood's prior felony assault conviction, to testify at sentencing.

The majority also references nineteen prior arrests between 1981 and 1984 which Dr. Kirkland mentions in his report as potentially damaging evidence. However, many of these

94

mitigating evidence without introducing the damaging aspects of Dr. Kirkland's potential testimony undermines the validity of any decision not to even investigate the critical portions of his report on this basis.

The majority opinion also suggests that because Wood was in special education and mentally impaired, the jury would have been less likely to believe that he dropped out of school to support his family. (Maj. Op. at 53, 67–68.) Assuming that a jury would have used evidence of Wood's mental impairments against him directly contravenes the Supreme Court and Eleventh Circuit cases that have consistently held that diminished mental capacity may suggest to a jury that a defendant is in fact "less morally culpable," and that evidence of even mild retardation is mitigating evidence that should be investigated and presented to the jury. See Atkins, 536 U.S. at 306–07, 317–18; Cunningham v. Zant, 928 F.2d 1006, 1017–19 (11th Cir. 1991).

The trial court in Wood's case found that there were no mitigating factors to balance against the aggravating factors. In a case such as this, where evidence of

arrests never resulted in convictions and the existing law pertaining to admission of such evidence was favorable to Wood. For example, see U.S. v. Eubanks, 876 F.2d 1514, 1516–17 (11th Cir. 1989) (inappropriate for prosecutor to question defendant about prior arrests that did not result in convictions); U.S. v. Lay, 644 F.2d 1087, 1091 (5th Cir. 1981) (improper for prosecutor to question defendant about prior arrest without conviction); U.S. v. Labarbera, 581 F.2d 107, 108–09 (5th Cir. 1978)(mere arrest without conviction for any offense inadmissible to show general lack of credibility); U.S. v. Hodnett, 537 F.2d 828, 829 (5th Cir. 1976) (same); U.S. v. Garcia, 531 F.2d 1303, 1306–07 (5th Cir. 1976) (same).

Wood's mental impairments could have mitigated his sentence, counsel's failure to present it was a fatal "breakdown in the adversarial process," Collier v. Turpin, 177 F.3d 1184, 1204 (11th Cir. 1999), which must undermine our confidence in the application of the death penalty in this case. Although the nature of the crime was serious, it was not so heinous as to foreclose the possibility that a reasonable jury might have returned a different sentence had they been presented with the substantial mitigating evidence of Wood's mental status, which is discussed above. See, e.g., Rompilla v. Beard, 545 U.S. 374, 393 (2005) (finding prejudice where defense counsel failed to present mitigating evidence of the defendant's abusive childhood and mental health issues in case where the defendant repeatedly stabbed the victim and set him on fire). Any other suggestion not only impermissibly abrogates the critical role of defense counsel by relieving them altogether of any responsibility to present mitigating evidence, but it also usurps the role of the jury by condemning to death all those charged with particular crimes, regardless of their individual circumstances, in direct contravention of both Supreme Court and Eleventh Circuit precedent. See, e.g., Kansas v. Marsh, 548 U.S. 163, 175 (2006) ("[O]ur precedents . . . oblige sentencers to consider [mitigating evidence] in determining the appropriate sentence." (emphasis added)); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("Mitigating evidence, when available, is

appropriate in <u>every case</u> where the defendant is placed in jeopardy of receiving the death penalty." (emphasis added)).

Finally, I note that even in the absence of any mitigating evidence of mental impairments, the jury vote recommending the death penalty was ten to two, which is the minimum required to recommend a sentence of death under Alabama law. <u>See</u> Ala. Code § 13A-5-46(f).[16]  Thus, in light of the compelling available mitigating evidence in this case, coupled with the narrow margin by which the jury rendered its recommendation of death, "there is a reasonable probability that the result of the proceeding would have been different,"  <u>Brownlee</u>, 306 F.3d at 1069 (internal quotations and citations omitted), had counsel performed effectively.

## V.  <u>Conclusion</u>

In sum, I agree with the district court that there was clear evidence available that Wood "suffers some of the same limitations of reasoning, understanding, and impulse control as those described by the Supreme Court in <u>Atkins</u>.  [Thus, c]ounsel's failure to investigate this issue at all or to present any of this evidence seriously undermines our confidence in the application of the death sentence."

---

[16] Alabama Code § 13A-5-46(f) provides:

"The decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors.  The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors.  The verdict of the jury must be in writing and must specify the vote."

Brownlee, 306 F.3d at 1073.  As in Wiggins, Wood was undoubtedly prejudiced by Trotter's "halfhearted mitigation case."  539 U.S. at 526.  For the foregoing reasons, I agree with the district court's finding that the state court's application of Strickland to the facts of this case involved an unreasonable application of clearly established federal law.